John Glasscock sued Eagle Products, Inc. (hereinafter "Eagle"), alleging claims of breach of contract, misrepresentation of facts, and deceit.[1] Eagle filed a motion for a summary judgment, with supporting documents; after a hearing, the trial court denied the motion. The case proceeded to trial on June 17, 2002. At the close of Glasscock's case, Eagle moved for a judgment as a matter of law ("JML"). The trial court granted Eagle's motion for a JML "as it relate[d] to fraud and den[ied] as it relate[d] to the contract." Eagle rested its case without calling any witnesses and then renewed its motion for a JML on the breach-of-contract claim; the trial court denied the motion. The jury returned a verdict in favor of Glasscock and awarded him $500,000 in damages. Eagle filed a postverdict motion for a JML, or, in the alternative, a new trial, which it subsequently amended to request, in the alternative, a remittitur. The trial court denied Eagle's posttrial motion, and Eagle appeals, presenting three issues:
 "I. Whether Eagle is entitled to judgment as a matter of law in its favor on Glasscock's breach of contract claim. *Page 282 
 "II. Whether Eagle is entitled to a new trial or remittitur because the damages award of the jury is unsupported by the evidence and so excessive as to necessarily be the result of passion, bias, prejudice, or other improper motive.
 "III. Whether Eagle is entitled to a new trial because the trial court erred by allowing Mark Naro to testify regarding his business dealings with Eagle."
The standard of review of a ruling on a motion for a JML is well settled:
 "An appellate court, when reviewing a ruling on a motion for a judgment as a matter of law, uses the same standard the trial court used initially in granting or denying the motion. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala. 1997). Regarding questions of fact, the ultimate question is whether the nonmovant presented sufficient evidence to allow the case or the issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala. 1992). For actions filed after June 11, 1987, the nonmovant must present `substantial evidence' in order to withstand a motion for a judgment as a matter of law. See § 12-21-12, Ala. Code 1975; West v. Founders Life Assur. Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, supra, at 1353. In reviewing a ruling on a motion for a judgment as a matter of law, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id.
Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court's ruling. Ricwil, Inc. v. S.L. Pappas Co., 599 So.2d 1126 (Ala. 1992)."
Bell v. T.R. Miller Mill Co., 768 So.2d 953, 956 (Ala. 2000) (footnote omitted). "[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. ofFlorida, 547 So.2d 870, 871 (Ala. 1989).
The record shows that in January 1989 Glasscock contacted Joe Cocquyt, the general manager for Eagle, to discuss becoming a distributor of Eagle products. Eagle manufactures premium dog food and pet supplies. A few months later, Bill Lehr, a territory manager for Eagle, spoke with Glasscock and arranged an interview. After the personal interview, Lehr notified Glasscock by letter that he had been awarded the distributorship. The letter, dated June 14, 1989, stated, in relevant part:
 "After several months of discussing the distributing of Eagle Products in northern Alabama, this letter is to confirm that you will become our northern Alabama distributor. And, to consummate this distributorship agreement, we must have your initial order by June 30th, 1989, and product must be delivered to you by July 14, 1989.
 "If you have any questions regarding these requirements, please call me."
After more negotiations, Glasscock sent Cocquyt a letter, dated July 12, 1989, which stated, in part:
 "The distribution of Eagle Pack and Hy-Ration lines of pet food and the relationship between Spring Creek Pet *Page 283 
Supplies[2] and Eagle Products, Inc. is exciting to me. Following is an outline of the topics of our conversation of July 11, 1989, relating to the Letter of Agreement between Eagle Products, Inc. and Spring Creek Pet Supplies.
 "The enclosed outline will list the topics and counties involved in the discussed agreement."[3]
Cocquyt mailed Glasscock a letter, dated July 26, 1989, finalizing the details of the distributorship agreement; that letter stated, in relevant part:
 "In receipt of your letter of July 12, I am replying with the following guidelines as far as your distribution of our products from Eagle. (Hy-Ration 
Eagle Pack Premium Line)
 "Per our letters dated to you, from June 14th, 1989, . . . we are allowing distribution of our products in the State of Alabama, north of Birmingham. The counties included in this territory are:
 "Lauderdale Jackson Lawrence DeKalb Cullman Limestone Colbert Morgan Marion Blount Madison Franklin Marshall Winston Etowah
 "Cherokee Walker Calhoun Lamar Jefferson Cleburne Fayette St. Clair
". . . .
 "In the event of Eagle Products, Inc. choosing to sever the distributorship agreement with Spring Creek Pet Supplies, Eagle Products will pick up and pay for any product that is dated not more than 90 days old."[4]
In January 1992, Glasscock moved his pet-supplies business into a larger warehouse, and, in order to help with overhead, he expanded his distributorship business to include a retail store, in which, in addition to Eagle products he sold products of Eagle's competitors. Glasscock testified that "at first when [he] opened the retail store it was predominately Eagle and over time [he] picked up some other lines. . . . In 1998, [he] had a larger mix."
In 1996, Glasscock received a letter from Lehr,[5]
addressed to "All Eagle Customers," which explained that based upon Eagle's new distributor criteria, "all customers [would] be classified as a Distributor or Direct Buy account." The letter also stated that Glasscock's territorial sales manager would review the criteria and provide him "with an application for either Distributorship or Direct Buy." Attached to this letter was a list of 18 criteria, which stated, "[i]f you do not meet these criteria, you *Page 284 
will be classified as a Direct Buy Account." Glasscock testified at trial that after he received that letter, Lehr and Ronald Rankin, an Eagle sales representative, met with him at his office:
 "A: . . . Bill Leer [sic] and a rep that I had at that time was named Ronald Rankin did show up and announce at my office and after I got this letter and talked to me about what it would be — what it would take to be a distributor.
"Q [Glasscock's attorney]: What did they tell you?
 "A: One of the things mentioned at the time was I would have to have a sales rep, that I could not be the person that went out and sold. I would have to hire somebody. I was willing to pay half the cost which would probably cost . . . me $30,000, but I will go for fifteen, if you will. He said no, it is your responsibility — but — Would you reask the question?
"Q: Did you remind him that you had a contract?
"A: I did remind him and he said had a contract.
"Q: How did the conversation end?
 "A: It basically was telling me that my understanding or remembrance of it [is] that I basically have to do what they wanted me to do."
Glasscock testified that he did not meet several of the required criteria for distributors, including the minimum-purchase requirement; the requirement to "dedicate a key person to be responsible for sales"; the requirement that he be engaged in the "full-time business of distributing pet supplies"; the requirement that he "exclusively participate in the wholesale pet supply distribution business"; the requirement that he "have no direct involvement in the retail business"; and the requirement that "accounts must be maintained on current status."
Judi Hurst, vice president of administration for Eagle, explained at trial what type of account Eagle considered to be a direct-buy account:
 "A: A direct-buy account we considered that if they had their own retail store — because we found that people that had their own retail store had lost the focus on going out and promoting our food because they could buy it at wholesale from us and sell it at retail and have a better margin and make more money per bag selling it out of their base store than if they distributed it. If they distributed it, they sell it at wholesale which is a mark-up from our delivery, but then they have far better margin if they sell it in their retail store.
 "Q [Glasscock's attorney]: Did you find that most of the existing distributors who did not meet the new criteria were people who owned retail stores?
"A: Yes.
 "Q: I mean, what was the reason or the purpose in converting those people to direct-buy accounts as opposed to requiring them to buy it from the distributor just like everybody else?
 "A: Well, so, that we could set up a distributor in their area that could get out to the other retail stores and have them pick up Eagle as the new line of food to sell out of their store.
 "Q: For example, if you were going to set up a new distributor in North Alabama, why would you allow John Glasscock to buy the products directly from you instead of requiring him to buy it from the North Alabama distributor?
 "A: Well, because John had been a customer for such a long time, Eagle continued to let the account that had existed prior to the 1996 reorganization continue to buy directly from Eagle so that they could continue to get the larger discount." *Page 285 
Hurst mailed Glasscock a letter, dated July 11, 1996, which stated:
 "The purpose of this letter is to outline and confirm the relationship between Eagle Products, Inc. and Spring Creek Pet Supplies.
 "In an effort to more accurately describe the business relationship between Eagle and its various customers, we have been in the process of identifying and categorizing our relationship with our various customers. Spring Creek Pet Supplies is what Eagle Products categorizes as a `direct-buy account.' In other words, Spring Creek Pet Supplies purchases product from Eagle Products for resale through its own retail outlet sources. It is not our intention to limit or in any way alter or amend that relationship between Eagle Products and Spring Creek Pet Supplies.
 "You will be happy to know that Eagle Products is making a concerted effort to become more visible in the nationwide market. In that respect, we are in the process of appointing territorial sales managers and distributors for the various regions nationwide. As of the date of this letter, Eagle Products has not yet assigned a territorial sales manager or distributor for Alabama. However, we anticipate appointing a territorial sales manager and/or distributor sometime in the near future. The function of the territorial sales manager and/or distributor is to assist accounts like Spring Creek Pet Supplies in promoting the Eagle Products' line.
 "We have enjoyed our relationship with Spring Creek Pet Supplies and look forward to a continuing long-term future relationship."
(Emphasis supplied.)
Glasscock stated at trial that he understood that as a direct-buy account he could continue to purchase product from Eagle at the same price he paid when he was classified as a distributor. Hurst explained the benefits that were available to direct-buy accounts:
 "Q [Eagle's attorney]: Did the other distributors who were reclassified as direct-buy accounts continue to buy directly from Eagle?
"A: Yes, and they still do today.
 "Q: So, when you continued to get some orders from Mr. Glasscock in August of '96 and maybe a few orders in '97, a couple in '98, was that anything out of the ordinary?
"A: No, it is not.
". . . .
 "Q: Did Eagle provide any of the benefits that we have talked about that it continues to provide to its distributors, did Eagle provide any of those benefits to Mr. Glasscock after July of '96?
 "A: I have no knowledge of that. I would imagine if he requested frequent-feeder cards[6] in his order, frequent-feeder cards would have been sent to him. If he requested brochures, they would have been sent. If he requested any of our materials on his order or through a phone call or fax, they would have been sent to him.
 "Q: That would have been something that would typically be sent to a retail seller?
"A: Yes.
"Q: Or to a direct buyer? *Page 286 
 "A: Or a direct buyer. Direct-buy accounts also have the advantage of the frequent-feeder programs and our couponing program."
In regard to Hurst's July 11 letter, Glasscock testified at trial:
 "Q [Eagle's attorney]: [In] that letter she told you what the distributor letter had told you that you were being reclassified as a direct-buy account?
"A: In her opinion, that is true, yes.
"Q: That is what the letter says, isn't it?
"A: It does.
 "Q: And you knew at the time you received that letter in July of 1996, insofar as Eagle was concerned, you were no longer one of their distributors?
"A: That was Eagle's opinion.
 "Q: Well, you knew when you entered the contract with them in 1989, didn't you, Mr. Glasscock, that they had the right to terminate your distributorship if they wanted to?
"A: They did if they bought back the product from me.
 "Q: Well, in July of 1996, you did not have any product to be bought back, did you?
 "A: I did not agree in July of '96 — but I did not have — I had product in the store I was selling at that time, but I don't — I can't say it was a 90 days. My order was earlier in the year.
 "Q: That last order that you had made from Eagle prior to July of '96 was January of 1995; isn't that correct?
"A: I will have to look at all of those invoices.
"Q: Well, you don't remember that?
"A: (No response.)
"Q: You don't have any recollection of that?
 "A: I do not remember that exact date. I know that I had — I will say that I know that the order was more than 90 days, if that takes care of your question.
 "Q: And you never asked Eagle when you got this July of 1996 letter to buy back any of your product, did you?
"A: I contacted my lawyer to write them a letter.
 "Q: Well, you never at any time asked Eagle to buy back any of your product?
"A: No, I did not.
". . . .
 "Q: . . . Well, let me ask you this, are you telling these ladies and gentlemen of the jury that your understanding of the agreement you had with Eagle in July of 1989 was that you can terminate my distributorship but only if I agree to it?
 "A: No. They had to offer to buy back the inventory I had in stock.
"Q: That was 90 days over?
"A: Yes.
"Q: You did not have any at that time?
"A: Not July letter — 1996 letter."
Glasscock testified further at trial:
 "A: The contract stated that the way to sever the agreement with me was to buy back any product that was not more than 90 days old.
 "Q [Glasscock's attorney]: So, did you continue on with the business as usual?
"A: Yes, I did."
Glasscock's attorney at the time, Rebecca A. Narmore, sent Eagle a letter, dated August 23, 1996, which stated, in pertinent part:
 "It is my understanding that Eagle Products, Inc. is reorganizing its categories of customers in to `direct-buy accounts' and distributors. It is my understanding also that Spring Creek Pet Supplies has been categorized by your company as a `direct-buy account.' *Page 287 
 "In July, 1989, Eagle Products, Inc. established a distributorship relationship and agreement between John Glasscock of Spring Creek Pet Supplies. He was granted distributorship of your products in the State of Alabama. However, under your letter of July 11, 1996, it appears that Mr. Glasscock will no longer be a distributor, but will be a direct-buy account which will eliminate his classification as an exclusive[7] distributor of Eagle Products, Inc.
 "This letter is to inform you that Mr. Glasscock is not in agreement with your letter of July 11, 1996, which re-classifies him as a direct-buy account when he has been a loyal distributor for Eagle Products, Inc. exclusively in the State of Alabama since 1989.
 "This attempt by Eagle Products, Inc. to sever the exclusive distributorship agreement with Spring Creek Pet Supplies will result in loss of business and loss of income to my client. It is John Glasscock's intention to continue to be the exclusive distributor for Eagle Products, Inc. in the State of Alabama pursuant to your distributorship agreement dated June 26, 1989. In light of your letter of July 11, 1996, I would appreciate a letter reaffirming my client [']s distribution status.
 "I will mark my file for ten days from the date of this letter for your explanation and clarification of the intentions on the part of Eagle Products, Inc. . . ."
In reply, Jeffrey A. Johnson, Eagle's attorney, sent Narmore a letter, dated September 13, 1996; that letter stated, in relevant part:
 "The following is in response to your letter dated August 23, 1996 addressed to Judi Hurst of Eagle Products.
 "Spring Creek Pet Supplies is classified as a direct-buy account as outlined in Ms. Hurst's letter of July 11, 1996. If you should happen to have any questions or wish to discuss this matter, please contact me. Otherwise, as outlined in Ms. Hurst's July 11, 1996 letter, your client, Spring Creek Pet Supplies, may buy directly from Eagle Products, but may not distribute on the wholesale market."
Glasscock testified that at the time Narmore received Johnson's letter, he had new Eagle product in stock and had received an invoice, dated August 6, 1996, from Eagle. Glasscock also testified that Eagle never bought this product back and that he never asked them to buy it back or contacted them after receiving this letter. He stated:
 "Q [Eagle's attorney]: Did you personally after July of '96, after you got that letter from [Judi] Hurst, have any contact with anybody from Eagle?
"A: From '96?
 "Q: From '96 to '99? From '96 till . . . 1999, did you personally have any contact with anybody from Eagle other than occasionally ordering a little bit of product?
"A: I don't remember having contact at that point."
Hurst testified that Eagle never contacted Glasscock about buying back the product for which Glasscock received an invoice in August.
In November 1996, Glasscock received a letter from Hurst and James Cocquyt, Sr., president and chief executive officer of Eagle, which stated:
"Dear Valued Customer,
 "We at Eagle Products are striving to build a stronger and more responsive *Page 288 
relationship between ourselves and you our distributors. The attached letter will give you the opportunity to let us know how we are doing servicing your needs. . . . We will be using your input to build a better Eagle Products and to strengthen our relationships with our customers."
Thereafter, Glasscock continued to receive letters from Eagle in regard to various Eagle programs and special offers. Hurst testified that Eagle maintained a customer list, and that all Eagle customers, regardless of whether they were classified as a distributor or a direct-buy account, received these letters. Glasscock stated at trial that he last made a purchase directly from Eagle in 1998. He testified specifically:
 "Q [Glasscock's attorney]: Did you — Was '98 the last year you purchased anything direct from the Eagle plant?
 "A: Purchased directly from them, yes, that is correct.
 "Q: Were you purchasing items from other sources?[8]
"A: Yes, I was after that point. From that point —
"Q: Still do?
"A: Yes, sir.
"Q: Do you still have business with Eagle?
"A: I still have Eagle [products] in my store today."
Glasscock testified that he did not have any knowledge of anyone distributing Eagle products in Alabama between July 1989 and July 1996, when he received Hurst's letter. Glasscock testified that in 1999, he learned that Mark Naro was a distributor for Eagle in Alabama. He stated:
 "Q [Eagle's attorney]: Isn't it a fact Mr. Naro came on board with Eagle in May of 1999, that would have been almost a year since you had last bought anything from Eagle even if you had found out about Mr. Naro on the day he started?
"A: That is true."
Glasscock stated that "[he] would go to [his] accounts and hear someone has stopped by talking to them about Eagle, and that is basically how [he] found out" that Naro had been hired as a distributor for Eagle in Alabama. Specifically, Glasscock testified:
 "Q [Eagle's attorney]: And when you found out about Mark Naro, you did not contact anybody from Eagle to talk about it?
"A: No, I did not.
 "Q: It's your contention in this case, as I understand it, Mr. Glasscock, that Eagle breached their contract with you when they appointed Mark Naro as distributor?
 "A: They did. They put somebody in my geographic area.
 "Q: And all of — some of the other stuff — not all of it, but some of the other stuff that you have talked about, you don't contend any of that was a breach of your contract, do you?
 "A: I believe they were — they were flirting with a breach, but they did not breach.
 "Q: The only thing you say they did to breach their contract with you was to appoint Mark Naro?
"A: That is correct."
In June 1999, Glasscock received an e-mail from one of his customers; the e-mail stated that the customer had been contacted *Page 289 
by another Eagle sales representative, Naro, and that she was upset because based on Naro's cost structure it appeared that Glasscock had been overcharging her. Glasscock testified that he lost many of his accounts because Naro was underpricing him. Glasscock stated that from 1989 to 1998 he purchased approximately $424,000 of product directly from Eagle. Hurst testified that during that same period Glasscock had purchased approximately $393,929 of product from Eagle: $53,059 in 1990; $62,335 in 1991; $76,734 in 1992; $64,859 in 1993; $54,051 in 1994; $14,086 in 1995; $14,572 in 1996; $32,177 in 1997; and $22,056 in 1998. She stated that Eagle "would expect more" volume of product purchases by its distributors than the amount purchased by Glasscock either before or after the 1996 reorganization. She testified that Eagle expects their "distributors today and then" to buy approximately $150,000 to $200,000 of product a year. Hurst testified that Eagle no longer gave exclusive territories to distributors and that she knew of no one who still had an exclusive territory with Eagle.
Glasscock testified that he planned on continuing to work until he reached age 65. He testified specifically:
 "Q [Eagle's attorney]: Had Mark Naro not come into the picture, was it your intention in continuing selling [Eagle products] in the Birmingham, Huntsville, Cullman [areas]?
 "A: I have already been doing that even though the orders are smaller than they have been in years prior. I continue to service the customers there."
Naro testified by deposition that he was the Alabama distributor for Eagle from May 1999 until "between March and April of 2000," and that he was not aware of Glasscock at the time he started distributing for Eagle. According to Naro, he first became aware of Glasscock when several of the stores he approached to sell Eagle products informed him that Glasscock was their distributor. He stated that he asked Eagle about Glasscock and was informed that Glasscock's contract had been canceled. He stated that he got a representative from Eagle to go with him to those stores and explain that Glasscock was no longer a distributor for Eagle because he paid his invoices late, did not call on customers regularly, and did not order enough product. He testified that he serviced many of the counties that were originally part of Glasscock's geographic territory, including Jefferson County, Cullman County, Madison County, and Walker County. According to Naro, as an Eagle distributor, he sold a monthly average of "close to thirty thousand" dollars worth of product.
The dispositive issue argued by Eagle on appeal is "[w]hether Eagle is entitled to judgment as a matter of law in its favor on Glasscock's breach of contract claim." As noted, Glasscock contends only that Eagle breached its contract with him by appointing Naro as a distributor in his geographical area. Neither Glasscock nor Eagle presented testimony or other evidence as to what type of relationship they thought they had or otherwise attempted to analyze the legal nature of the relationship created by their contract. It is unnecessary to determine whether Glasscock was an independent contractor or an employee of Eagle, however, because under either classification the contract was terminable at will. "`Absent a contractual provision to the contrary, an independent contractor/principal agency relationship is terminable at any time at the will of the principal or the agent. See generally Restatement (Second) ofAgency § 117 cmt. a (1958). . . .'" Ex parte Gardner,822 So.2d 1211, 1218 (Ala. 2001), quoting Kaldi v. Farmers Ins.Exch., 117 Nev. 273, 21 P.3d 16 (2001); see also Ex parteMichelin North America, Inc., 795 So.2d 674, 677 (Ala. 2001) ("In Alabama, an employment *Page 290 
relationship is ordinarily `at will,' and the fundamental principle of employment at will is that the employment relationship is terminable by either party at any time and for any reason."), and Hickenbottom v. Preferred Risk Mut. Ins.Co., 514 So.2d 881, 882 (Ala. 1987) ("Contracts without a fixed term are terminable at the will of either party and may be terminated for any cause or for no cause.").
As noted, in 1996 Eagle notified Glasscock, initially by letter and then in person, that in order to retain his distributorship status, Glasscock would have to meet specified criteria. Glasscock testified that he did not meet many of the required criteria, and in July 1996 Eagle notified Glasscock that he was being classified as a direct-buy account, rather than as a distributor.
Glasscock argues in his brief to this Court that "Eagle desperately maintains, in hindsight, that [Judi] Hurst, Eagle's vice-president, severed its distributorship relationship with Glasscock on July 11, 1996." However, Glasscock conceded at trial that he knew at the time he received Hurst's letter that Eagle's opinion was that he was no longer their distributor, and his attorney stated in her reply letter to Hurst that "under your letter of July 11, 1996, it appears that Mr. Glasscock will no longer be a distributor, but will be a direct-buy account which will eliminate his classification as an exclusive distributor of Eagle Products, Inc." Glasscock argues that Hurst's letter "never informs [him] that he is no longer Eagle's exclusive distributor or that he cannot distribute on the wholesale [m]arket." In fact, her letter states, "Spring Creek Pet Supplies is what Eagle Products categorizes as a `direct-buy account.' In other words, Spring Creek Pet Supplies purchases product from Eagle Products for resale through its own retail outlet sources." She also stated in that letter that Eagle had not assigned a distributor for Alabama as of the date of the letter, but that it anticipated appointing a distributor "in the near future." Glasscock argues that Hurst continued to refer to him as Eagle's distributor in her next correspondence to him. That letter, as noted, is addressed to "Dear Valued Customers" and refers generally in its body to "you our distributors." Hurst explained that Eagle maintained a customer list, and that all of its customers, regardless of whether they were classified as a distributor or a direct-buy account, received that letter, as well as other mailings.
Glasscock also argues that "in 1996, 1997, 1998, and 1999, the parties continued their relationship as before." However, Hurst testified that "[d]irect-buy accounts also have the advantage of the frequent-feeder programs and our couponing program," and she stated that direct-buy accounts were able to purchase Eagle products for the same price as distributors. Hurst stated that the other distributors who were classified as direct-buy accounts continued to purchase from Eagle after the new classification and "still do today," so it was not unusual for Eagle to continue to receive orders from Glasscock. Glasscock testified at trial that he understood that, as a direct-buy account, he could continue to purchase products from Eagle at the same price he had paid as a distributor. He stated that the last year he purchased directly from Eagle was 1998.
Glasscock argues in his brief to this Court:
 "On September 13, 1996, Eagle's attorney, for the first time, informs Glasscock that he cannot `distribute on the wholesale market.' Prior to this letter, this language had never been used. However, Eagle Pet Products never elects to sever the relationship, pursuant to the terms that it had chosen, by purchasing back from Glasscock product not more *Page 291 
than ninety days old, though Glasscock had on hand Eagle Product that was less than ninety days old."
At trial, Glasscock did not dispute that Eagle had the right to sever the distributorship agreement, he argued only that in doing so it did not comply with the terms of the contract. Under the distributorship agreement between Glasscock and Eagle, in the event Eagle severed the distributorship relationship, Eagle was required to "pick up and pay for any product that [was] dated not more than 90 days old." Glasscock testified that he knew that Eagle could terminate the distributorship "if they bought back the product from [him]." Glasscock testified that he did not have any product less than 90 days old at the time he received the July 1996 letter. Glasscock stated that he had placed an order in August 1996 and therefore had new product on hand when he received a letter from Eagle's attorney, which he claims is the first time Eagle informed him that he could not distribute on the wholesale market. However, Hurst's July 11, 1996, letter clearly stated that Glasscock's account had been categorized as a direct-buy account and that Eagle anticipated appointing a distributor in Alabama "in the near future." The September 13, 1996, letter only reaffirmed Eagle's decision to terminate the distributorship agreement, and stated "Spring Creek Pet Supplies is classified as a direct-buy account as outlined in Ms. Hurst's letter of July 11, 1996." Therefore, at the time Eagle terminated the relationship, July 11, 1996, there was no product Eagle was required to buy back in conjunction with the termination of Glasscock's distributorship status, and Eagle effectively terminated the distributorship agreement by notifying Glasscock of his direct-buy classification in Hurst's July 1996 letter. In any event, even if Glasscock had product less than 90 days old at the time of the July 11, 1996, letter, it would not have prevented the termination. The agreement only states that "[i]n the event, Eagle Products, Inc. choos[es] to sever the distributorship agreement with Spring Creek Pet Supplies, Eagle Products will pick up and pay for any product that is dated not more than 90 days old"; it does not say that as a condition precedent to a legally effectual termination Eagle must pick up and pay for the product. Accordingly, the trial court erred by refusing to grant Eagle's motion for a JML.
For the foregoing reasons, the trial court's order denying Eagle's motion for a JML is due to be, and hereby is, reversed and a judgment rendered in favor of Eagle Products, Inc. Because we are rendering a judgment for Eagle on this issue, we need not address the other issues Eagle raises on appeal.
REVERSED AND JUDGMENT RENDERED.
SEE, LYONS, BROWN, and STUART, JJ., concur.
[1] Glasscock also named Mark Naro, at one time a distributor for Eagle, as a defendant, but later voluntarily dismissed his claims against Naro.
[2] Spring Creek Pet Supplies is a business formed by Glasscock, which he operates as a sole proprietorship.
[3] The record does not contain a copy of the outline referenced in this letter.
[4] The record contains no other reference to the parties' right of severance.
[5] By the time of this letter, Lehr had become a national sales manager with Eagle.
[6] Hurst stated that Eagle has a frequent-feeder program, so that "when you buy twelve bags . . . [you] get the thirteenth bag free."
[7] The distributorship agreement does not state that it is exclusive, but Eagle never contests this characterization of the contract.
[8] Glasscock testified that he bought Eagle products from other distributors to resell to his customers; he stated that the other distributors were "charging [him] the handling charge for the product, but they were not charging [him] the normal wholesale mark-up."