This appeal involves, among other things, certain disclosure requirements of the Truth-in-Lending Act, 15 U.S.C. § 1601 et seq. ("TILA"), as they relate to "check-in-the-mail" loan programs. A.L. Parrish appeals from the Jefferson Circuit Court's summary judgment on Parrish's TILA claims and from that court's order decertifying the class.[2] We affirm.
 I. Facts
The procedural history of this case, initiated by Parrish in 1992, has been somewhat tortured; most of that history is not relevant here. We limit our focus to the facts necessary to resolve the narrow issues before us. Those facts, which are generally undisputed, are as follows.
Blazer Financial Services, Inc., and Great Western Financial Corporation (hereinafter referred to collectively as "Blazer") mailed loan solicitations to some of its customers in what became known as Blazer's "check-in-the-mail" ("CIM") program. Customers included on the CIM mailing list would receive from Blazer a solicitation letter; at the bottom of the letter was a detachable check. The letter, which displayed Blazer Financial's logo and address at the top, instructed the recipient to read the text printed on the *Page 409 
reverse side of the letter under the heading "Loan Agreement and Federal Disclosure Statement" ("the loan agreement").[3]
When a customer cashes the check, a Blazer representative contacts the customer to confirm the loan and notifies them of the date that the check clears Blazer's bank. Additionally, within 30 days of the date the check is cashed, Blazer mails the customer a follow-up TILA disclosure form and a payment book that specifies the starting date of the loan.
Parrish received the CIM solicitation letter and the attached check; he cashed the check, thereby becoming a debtor to Blazer. Parrish eventually defaulted on this loan. Later, Parrish sued Blazer, asserting violations of the TILA, as well as other claims that have since been dismissed.
On Parrish's motion, the trial court certified the action as a class action, naming as class members approximately 11,000 individuals who had obtained loans through Blazer's CIM program. Subsequently, Blazer filed counterclaims against many of the class members who, like Parrish, were in default on their loans.
After much procedural wrangling, the trial court granted Blazer's motion for a summary judgment as to all of Parrish's claims and granted Blazer's motion to decertify the class. This appeal followed.
 II. Analysis
Parrish raises two issues on appeal. First, Parrish argues that the trial court erred in entering a summary judgment on his claims alleging that Blazer had violated the TILA by failing to make proper disclosures and by failing to provide Parrish with a duplicate copy of the legal obligations arising out of his loan. Second, Parrish contends that the trial court erred in decertifying the class.
We review a summary judgment de novo and in accordance with the following principles:
 "The standard of review applicable to a summary judgment is the same as the standard for granting the motion, that is, we must determine whether there was a genuine issue of material fact and, if not, whether the movant was entitled to a judgment as a matter of law. Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and resolve all reasonable doubts against the movant. Wilson v. Brown, 496 So.2d 756, 758 (Ala. 1986); Harrell v. Reynolds Metals Co., 495 So.2d 1381 (Ala. 1986). See also Hanners v. Balfour Guthrie, Inc., 564 So.2d 412 (Ala. 1990).
 "... Ala. Code 1975, 12-21-12, mandates that the [nonmovant] meet [its] burden by 'substantial evidence.' Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Under the substantial evidence test the nonmovant must present 'evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)."
Brewer v. Woodall, 608 So.2d 370, 372 (Ala. 1992).
However, we review a trial court's decision to decertify a class by determining whether the trial court, in reaching that decision, exceeded its discretion. *Page 410 
Lackey v. Central Bank of the South, 710 So.2d 419, 421 (Ala. 1998)
 A. Parrish's TILA claims
"The [TILA] has the broad purpose of promoting 'the informed use of credit' by assuring 'meaningful disclosure of credit terms' to consumers." Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 559 (1980) (quoting 15 U.S.C. § 1601). Because the TILA is a "consumer protection statute which ... is remedial in nature," its disclosure requirements are to be "construed liberally in order to best serve Congress' intent." Ellis v. General Motors Acceptance Corp., 160 F.3d 703, 707 (11th Cir. 1998). In order to carry out its intent to assure "meaningful disclosure," Congress has empowered the Board of Governors of the Federal Reserve System to
 "prescribe regulations to carry out the purposes of [the TILA]. ... [T]hese regulations may contain such classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper to effectuate the purposes of [the TILA], to prevent circumvention or evasion thereof, or to facilitate compliance therewith."
15 U.S.C. § 1604(a). The implementing regulation for the TILA is known as "Regulation Z" (12 C.F.R. § 226), and the Board's official interpretations of the TILA and Regulation Z are dispositive unless they are "demonstrably irrational."[4] Milhollin, 444 U.S. at 565-68.
1. "Date of loan" and "due date" information
Parrish claims that the CIM program violates the TILA because, he contends, the loan agreement — the only document in the hands of the customer after the customer cashes the check attached to the solicitation letter — does not disclose the date of the loan or when the payments on the loan are due. We disagree.
With regard to most consumer-credit transactions such as the CIM program, the TILA requires the disclosure of "[t]he number, amount, and due dates or period of payments scheduled to repay the total of payments."[5] 15 U.S.C. § 1638(a)(6) (emphasis added). Additionally, Regulation Z requires disclosure of the "timing of payments scheduled to repay the obligation." 12 C.F.R. § 226.18(g).
The loan agreement provided:
 "The DATE OF THE LOAN shall be and FINANCE CHARGES SHALL BEGIN TO ACCRUE the date the check (Note) is paid by Creditor's bank. FIRST PAYMENT DUE DATE is one month after the Date of the Loan."
(Capitalization original.) Parrish contends that this language is insufficient as disclosure under the TILA because it does not provide the exact date the loan commenced and the date the first and subsequent payments are due.
Blazer responds by arguing that Regulation Z, as it read at the time Parrish received the solicitation materials for the CIM program, allowed for "delayed disclosure" of the date of the loan[6] in situations *Page 411 
where the loan is commenced without direct, "face-to-face" solicitation:
"(g) Mail or telephone orders — delay in disclosures. If a creditor receives a purchase order or a request for an extension of credit by mail, telephone, or any other written or electronic communication without face-to-face or direct telephone solicitation, the creditor may delay the disclosures until the due date of the first payment, if the following information for representative amounts or ranges of credit is made available in written form to the consumer or to the public before the actual purchase order or request:
"(1) The cash price or the principal loan amount.
"(2) The total sale price.
"(3) The finance charge.
 "(4) The annual percentage rate, and if the rate may increase after consummation, the following disclosures:
"(i) The circumstances under which the rate may increase.
"(ii) Any limitations on the increase.
"(iii) The effect of an increase.
"(5) The terms of repayment."
12 C.F.R. § 226.17(g) (1990) (emphasis added).[7]
Blazer argues that the CIM program qualifies as a written request for a loan (given the fact that the loan is initiated by the customer's signing and cashing the check, without face-to-face communication with a representative of Blazer), and that it made delayed disclosures by 1) telephoning CIM program customers to notify them of the date their check cleared Blazer's bank, and 2) mailing letters to its customers within 30 days of the check's clearance to confirm that date. Blazer contends that it would not be possible to give a specific payment-due date in the loan agreement because Blazer cannot, given the nature of the CIM program, be certain when a customer will cash the check.
Blazer's contention that the disclosures made through its CIM program are proper under 12 C.F.R. § 226.17(g) appears to be consistent with the Federal Reserve Board's own interpretation of that regulation:
"Section 226.17(g) allows creditors to defer TILA disclosures when a consumer makes a credit purchase or requests credit by mail, telephone, or any other written or 'electronic communication' without face-to-face or direct solicitation by the creditor. The deferral rule pre-dates online or Internet banking; the term 'electronic communication' included credit requests by telegraph transmissions and facsimiles. The rationale underlying the deferral is that creditors cannot provide transaction-specific disclosures in written form as required by the regulation at the time of the consumer's purchase or request. In such cases, creditors may delay providing disclosures until the first payment due date, provided certain information has been "made available in written form" before the consumer's request.
"The interim final rule provides as did the 1999 proposal that creditors offering *Page 412 
loan products by electronic communication (for example, those offered on the Internet) may not delay providing disclosures under § 226.17(g). The difficulties in providing disclosures for credit requests by mail or telephone are not present for credit requests received by e-mail or through the Internet. Thus, specific disclosures must be provided before transactions are consummated using electronic communication as defined in 226.36. The language has been revised from the proposal to clarify that the deferral rule in 226.17(g) remains available to creditors offering loan products by facsimile machine (as well as mail and telephone) without face-to-face or direct telephone solicitation."
Truth in Lending, 66 Fed. Reg. 17,329, 17,333 (March 30, 2001) (to be codified at 12 C.F.R. pt. 226) (emphasis added).
"Section 226.17(g) allows credit to be offered via mail, telephone, or other electronic means and full TILA disclosures to be deferred as long as a certain number of disclosures are 'made available in written form.' The rationale underlying the deferral is that, in some instances, the creditor cannot provide disclosures in the form required by the regulation because of the lack of face to face or direct interaction with the consumer. Because loan products offered by electronic communication (for example, those offered on the Internet) do not appear to pose the same difficulty, the Board believes that this deferral should not apply to electronic disclosures. The Board believes that permitting a deferral would not effectuate the purpose of the TILA to provide consumers with information about credit terms prior to being obligated. Thus, the proposed rule provides that specific disclosures must be provided before consummation of the transaction."
Truth in Lending, 63 Fed. Reg. 14,548, 14,549-50 (March 25, 1998) (to be codified at 12 C.F.R. pt. 226) (emphasis added); see also Truth in Lending, 64 Fed. Reg. 49,722, 49,726 (Sept. 14, 1999) (to be codified at 12 C.F.R. pt. 226).
Additionally, the Board's interpretation of 226.18(g), which, as noted above, requires the disclosure of the "timing of payments," appears to specifically address and approve of CIM loan programs such as Blazer's:
"Timing of payments. i. General rule. Section 226.18(g) requires creditors to disclose the timing of payments. To meet this requirement, creditors may list all of the payment due dates. They also have the option of specifying the 'period of payments' scheduled to repay the obligation. As a general rule, creditors that choose this option must disclose the payment intervals or frequency, such as 'monthly' or 'bi-weekly,' and the calendar date that the beginning payment is due. For example, a creditor may disclose that payments are due 'monthly beginning on July 1, 1998.' This information, when combined with the number of payments, is necessary to define the repayment period and enable a consumer to determine all of the payment due dates.
"ii. Exception. In a limited number of circumstances, the beginning-payment date is unknown and difficult to determine at the time disclosures are made. For example, a consumer may become obligated on a credit contract that contemplates the delayed disbursement of funds based on a contingent event, such as the completion of home repairs. Disclosures may also accompany loan checks that are sent by mail, in which case the initial disbursement and repayment dates are solely within the consumer's control. In such cases, *Page 413 
if the beginning-payment date is unknown the creditor may use an estimated date and label the disclosure as an estimate pursuant to 226.17(c). Alternatively, the disclosure may refer to the occurrence of a particular event, for example, by disclosing that the beginning payment is due '30 days after the first loan disbursement.' This information also may be included with an estimated date to explain the basis for the creditor's estimate. See Comment 17(a)(1)-5(iii)."
Comment 18(g)4., 12 C.F.R. pt. 226, Supp. 1, Subpart C — Closed-End Credit (emphasis added); see also Truth in Lending, 63 Fed. Reg. 16,669, 16,673 (April 6, 1998) (to be codified at 12 C.F.R. pt. 226) (discussing revisions to Comment 18(g)4.).
Even under a liberal construction of the provisions of the TILA we cannot hold that the disclosures included in Blazer's CIM program were insufficient under the TILA. Under 226.17(g) of Regulation Z and the Board's interpretations of that regulation, Blazer's delayed disclosure of the specific date of the commencement of the loan (i.e., when the check is paid by Blazer's bank) was proper. Furthermore, the "due date" provision in the loan agreement provided:
"The DATE OF THE LOAN shall be and FINANCE CHARGES SHALL BEGIN TO ACCRUE the date the check (Note) is paid by Creditor's bank. FIRST PAYMENT DUE DATE is one month after the Date of the Loan."
(Capitalization original.) This provision is consistent with the Board's interpretation of 12 C.F.R. § 226.18(g) that "disclosure may refer to the occurrence of a particular event, for example, by disclosing that the beginning payment is due '30 days after the first loan disbursement.'" See Clay v. Johnson, 264 F.3d 744, 747-49 (7th Cir. 2001) (discussing Comment 18(g)4. and the elimination of the "prohibition on disclosing the beginning payment date by referring to a specified event").[8]
2. Alleged failure to provide a copy of written disclosures
Parrish also claims that Blazer violated the requirement of the TILA that disclosures "reflect[ing] the terms of the legal obligation between the parties" are to be given to Parrish "in a form that [Parrish] may keep." 12 C.F.R. § 226.17(a)(1), (c)(1). Specifically, Parrish contends that he did not receive a duplicate copy of his signed promissory note, i.e., the signed check Parrish cashed. We find this contention to be without merit.
The reverse side of the check attached to the solicitation letter sent to Parrish provides lines for a signature and a date, a sentence cautioning the customer to "thoroughly read the contract before you sign it," and the following information:
"AMOUNT FINANCED .... $1,029.62
FINANCE CHARGE ...... $ 446.38
TOTAL OF PAYMENTS ... $1,476.00
ANNUAL PERCENTAGE RATE ... 25.11%
 "Repayable in 36 monthly installments of $41.00 each, beginning 30 days from *Page 414 
date of loan and then on the same day of each succeeding month until paid.
 "In consideration of monies received as a loan, the undersigned jointly and severally promise(s) to pay to Creditor the Total of payments in monthly installments as shown above and further agree(s) to terms and conditions set forth in the accompanying Loan Agreement and Disclosure Statement ('Agreement'), the provisions of which Agreement are incorporated herein.
 "NOTICE TO CONSUMER: BY SIGNING AND DEPOSITING (OR CASHING) THIS, YOU HAVE AGREED TO REPAY MONIES AS STATED. DO NOT SIGN THIS BEFORE YOU READ IT AND THE AGREEMENT, OR IF EITHER CONTAINS ANY BLANK SPACES.
 "The undersigned acknowledges receipt of a copy both of this instrument ('Note') and the Agreement."
(Capitalization original.)
Directly above the check, however, this very language (minus the signature line and date line and the cautionary sentence) is repeated below the words "BORROWER'S COPY OF NOTE." Therefore, Parrish's argument is actually reduced to the claim that the TILA requires Blazer to provide Parrish with a copy of the note with Parrish's signature. However, neither 226.17(a)(1) nor 226.17(c)(1) requires Blazer to provide Parrish with a duplicate copy of the signed note; rather, those provisions require Blazer only to provide Parrish with a copy of the terms of the legal obligation between them, which, as shown above, Blazer has done.[9]
Based on the above, we hold that Parrish has not presented substantial evidence tending to show that Blazer violated the TILA. Because there is no genuine issue of material fact, and because Blazer is entitled to a judgment as a matter of law, summary judgment was appropriate.
 B. Class decertification
Parrish also argues that the trial court erred in decertifying the class. As stated above, the issue is whether the trial court exceeded its discretion in decertifying the class. We hold that the trial court did not exceed its discretion.
The class, of which Parrish was the named representative, was certified under Rule 23(b)(3), Ala. R. Civ. P.,[10] and *Page 415 
purported to include approximately 11,000 members who had participated in the CIM program. In granting Blazer's motion to decertify, the trial court explained its rationale as follows:
 "The Plaintiff acknowledged in [his] briefs and oral argument that claims for actual damages under TILA should not be certified as a class because developments in the caselaw, such as Turner v. Beneficial Corporation,[242 F.3d 1023] (11th Cir., Feb. 22, 2001), required individual proof of the causal link between the violation and those damages. However, Plaintiff [has] continued to insist that ... statutory damage[s] under TILA could properly be pursued as a class action because the class members need not present individual proof in order to establish the violation or their right to recovery.in Nevertheless, the Court is convinced that the unique nature of the Plaintiff's TILA claim here is such that it would be inappropriate to attempt to try this case as a class action even for statutory damages.
 "The Defendants' [counterclaims] superimposed upon the TILA claims would create the result that individual proof of claims would predominate over class claims and destroy the manageability of the class. See, e.g., Heaven v. Trust Company Bank, 118 F.3d 735, 738
[(11th Cir. 1997)].
 "Secondly, Plaintiff has relied extensively in the presentation of TILA claims on argumentation that disclosures made on the loan document were not understandable to class members because of their poverty, lack of sophistication, and lack of education. Even if that be the case, it cannot realistically be assumed that all members of the class fit that personal profile, and individual fact-finding would be necessary to identify those persons to whom Plaintiff's arguments would be applicable. The individualization of the claims would in turn make the trial of this action as a class unmanageable.
 "Thirdly, Plaintiff [has] argued that language contained in the loan agreement [that] permitted the lender to stop payment on the check if the borrower had obtained a loan from Blazer within the prior sixty (60) days was a source of confusion and itself constituted a Truth-in-Lending Act violation. Yet, because of changes in the form promissory note used, this claim was only available to the Plaintiff Armetha Parrish and not to any other members of the class. Therefore, as to at least a certain portion of the Truth-in-Lending Act claims, Mr. Parrish's claims were not typical of those of the class.
 "Finally, the Court is aware that the statutory damage[s] recoveries for individuals seeking to vindicate their own rights under TILA are potentially as high as $1,000, plus attorney's fees and costs. By contrast, the portion of each class member's recovery participating in a pro rata distribution of a class action recovery would be only a small fraction of that amount. This results from the fact that 15 U.S.C. § 1640
establishes a maximum statutory damage[s] recovery for the class equal to the lesser of 1% of the net worth of the lender, or $500,000. The class which was certified in this case includes thousands of class members and, even assuming that the largest possible class recovery were obtained, each class member would receive an extremely small recovery, certainly less than $1 per class member. Given the disparity between the potential recovery as an individual and that as class member, the Court is of the opinion that a class action is not a superior method of adjudicating these disputes as to any class *Page 416 
member as required under [Rule 23(b)(3), Ala. R. Civ.P.]
 "This Court is aware that other Courts have certified class actions for statutory damages under the Truth-in-Lending Act, while others have declined certification. As the Court understands the matter, it has considerable discretion as to whether or not a class action would provide a superior method of adjudicating the Truth-in-Lending Act claims. It is the opinion of this Court that it would not.
 "The Court admits to being influenced in its decision to some degree by the fact that it has concluded that summary judgment must be granted in favor of the Defendant. If the case remained certified as a TILA class action, and summary judgment is granted, then all borrowers under this [CIM] program will be barred from all potential claims under TILA. In exchange for the potential of recovering less than $1 in damages, these individuals will experience the extinguishment of this class which, because of unique circumstances or the choice of different legal theories by their counsel, could be litigated successfully. This Court believes that it is the fair and more appropriate thing to allow the pursuit of potential claims which might be based on currently unknown and unexplored factual distinctions or arguments."
Class certification under Rule 23(b)(3) is not appropriate when class treatment of an action is not "superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3), Ala.R. Civ. P.; see Compass Bank v. Snow, 823 So.2d 667 (Ala. 2001). In this respect, we note that Parrish's argument that the class should not have been decertified must be premised on Parrish's argument that the summary judgment as to Parrish's TILA claim was not appropriate, because if it were not so premised Parrish would be acting, as the trial court noted, to the severe detriment of the remaining class members. While we also find the trial court's other reasons for decertification persuasive, we hold that, because the summary judgment was appropriate, class treatment was not superior to individual litigation by the class members; therefore the trial court did not exceed its discretion in decertifying the class.
 III. Conclusion
For the reasons stated above, the trial court's judgment is affirmed.
AFFIRMED.
Moore, C.J., and Woodall, J., concur.
Johnstone, J., concurs in part, concurs in the rationale in part, and concurs in the judgment.
Lyons, J., concurs in the rationale in part and concurs in the judgment.
[2] The trial court had initially certified this action as a class action and named Parrish as the class representative.
[3] Since this action was filed in 1992, Blazer has changed the language of its "Loan Agreement and Federal Disclosure Statement"; however, when we refer to the "loan agreement" we are referring to the loan agreement received by Parrish that provides the basis for this action.
[4] This appeal does not challenge the rationality of any of the Board's interpretations of the TILA or of Regulation Z.
[5] Transactions under an "open-end credit plan" are exempted from this rule. 15 U.S.C. § 1638(a).
[6] The current version of Regulation Z also allows for delayed disclosure; the differences between the current version and its predecessor are minor. The current version reads, in pertinent part, as follows:
 "If a creditor receives a purchase order or a request for an extension of credit by mail, telephone, or facsimile machine without face-to-face or direct telephone solicitation, the creditor may delay the disclosures until the due date of the first payment, if the following information for representative amounts or ranges of credit is made available ...."
12 C.F.R. § 226.17(g) (emphasis added).
[7] Parrish does not contend that he was not provided the information required by 12 C.F.R. § 226.17(g)(1)-(5).
[8] We find the following cases cited by Parrish in support of his argument factually distinguishable and therefore unpersuasive: Shepeard v. Quality Siding Window Factory, Inc., 730 F. Supp. 1295, 1300-02
(D. Del. 1990) (finding a TILA violation where no payment-due dates were given in a lien contract and where no effort was made to invoke the "delayed disclosure" provisions of 226.17(g)); In re Black,411 F. Supp. 749, 750-51 (S.D. Ohio 1975) (involving documents that gave no indication what part of the month payments would begin to be due and involving a lender who did not use "delayed disclosure"); In re Dangler,75 B.R. 931, 934 (Bankr. E.D. Pa. 1987) (finding a TILA violation where payments were to be made monthly, but there was no disclosure as to what month payments would begin).
[9] In fact, the Board has interpreted 226.17(a)(1) as allowing TILA disclosures to be placed on "a separate sheet of paper" from the credit contract. Comment 17(a)(1)2., 12 C.F.R. pt. 226, Supp. 1, Subpart C — Closed-End Credit.
[10]:Rule 23(b), Ala. R. Civ. P., provides:
 "An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
"....
 "(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."
Rule 23(a), Ala. R. Civ. P., provides:
 "One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."