882 So.2d 291 (2003)
Douglas DICKINSON and Barbara Dickinson
v.
LAND DEVELOPERS CONSTRUCTION COMPANY, INC.
Douglas Dickinson and Barbara Dickinson
v.
Cook's Pest Control, Inc.
1021276 and 1021277.
Supreme Court of Alabama.
November 7, 2003.
*294 Michael K. Beard and Thomas M. Powell of Marsh, Richard & Bryan, P.C., Birmingham, for appellants.
Donald D. Lusk and Leslie Ann Caldwell of Lusk & McAlister, P.C., Birmingham; and Jesse P. Evans III of Adams & Reese, LLP/Lange Simpson, Birmingham, for appellee Land Developers Construction Company, Inc.
Clifton E. Slaten, Mindi C. Robinson, and Jason J. Baird of Slaten & O'Connor, P.C., Montgomery, for appellee Cook's Pest Control, Inc.
PER CURIAM.
Douglas and Barbara Dickinson appeal from a summary judgment entered against them by the Shelby Circuit Court in their actions against Land Developers Construction Company, Inc., and Cook's Pest Control, Inc. We reverse in part, affirm in part, and remand.

I. Facts and Procedural History
On November 11, 1992, Land Developers and the Dickinsons entered into a contract for the construction of a house. Cook's issued the Dickinsons a "Subterranean Termite Control Damage Replacement Guarantee" for this house on February 25, 1993. This guarantee was effective for one year and was renewable annually. *295 Pursuant to this guarantee, Cook's provided an initial inspection and pretreatment of the Dickinsons' house against termites and conducted annual inspections thereafter. Those annual inspections checked, among other things, the moisture level of the house.
The Dickinsons moved into their house on December 20, 1993. Shortly after moving in, the Dickinsons began to notice a number of problems with their house. In early January 1994, the Dickinsons provided Land Developers with a "punch list" of items that needed to be completed. On October 2, 1994, the Dickinsons sent Land Developers another list of items that still needed to be addressed.
Six to nine months after moving into their residence, the Dickinsons discovered seals on certain of the windows were broken. On November 17, 1994, the Dickinsons' architect prepared a list of problems with the French doors in the house. In early 1995, the Dickinsons documented a leak in their "pool bath." On May 1, 1995, the Dickinsons wrote a letter to Land Developers stating that they would like Land Developers to address the noted problems as soon as possible and listing seven areas of concern with the house. On May 13, 1995, the Dickinsons sent a memorandum to Land Developers concerning cracks in the driveway and a water leak under their driveway and asking when it would address the previously noted problems.
The inspection report prepared by Cook's in 1995 noted that there was some water seepage in the crawl space under the house and that some wood material was "below grade," i.e., below the ground level. However, the reports prepared by Cook's in 1996 through 2000 failed to note any water seepage; the 1996 report stated that everything "Looks good!" Furthermore, the 1996, 1998, and 1999 reports prepared by Cook's concurred with the 1995 report in stating that there was wood in the Dickinsons' house that was below the outside grade level, but the 1994, 1997, and 2000 reports indicated that there was no wood below the outside grade level.
On April 26, 1996, the Dickinsons sent Land Developers a letter by certified mail; the letter outlined 11 residual problems with the house. Land Developers never responded to this letter. On October 30, 1999, the Dickinsons sent another letter via certified mail to Land Developers requesting that it fix several problems with the house. The Dickinsons described some of those problems as follows:
"1. The back concrete deck junction with the house and its poor caulking still leaks water. As you recall, your previous attempts to fix this failed. This has progressed to the point wherein these leaks have caused erosion of soil under the deck resulting in its sinking approximately three inches where it joins the house causing a subsequent tilt inward of the entire deck.
"2. The upper garage cement portion of the drive-way was also of concern to our cement consultant. He felt that water from the house drains was getting under the driveway and also causing soil erosion, sinking, and cracking.
"3. The replaced doors on the back of the house all have rotten wood framing.
"4. Multiple window panes in the front and back of the house have air leaks with water condensation and still have not been replaced."
After Land Developers failed to respond to the October 30, 1999, letter, the Dickinsons hired a structural engineer, Joel Wehrman, to inspect their house. Wehrman's inspection resulted in a written report.
In his report, Wehrman found that there was a separation between the brick veneer and the doorframes of the French doors at *296 the rear of the house. Wehrman opined that the separation was caused by the rotting of the wooden basement wall, which had resulted from the use of untreated wood in constructing the basement wall. Wehrman stated that the decay of the belowground wooden wall was inevitable. Wehrman also found that the use of the wooden wall resulted in a lack of lateral support for the house and could contribute to the separation of the superstructure from the foundation. In addition, Wehrman found that the driveway, walkway, and patio were cracking. Wehrman stated that this resulted from their having been constructed on fill soils, which had settled since construction.
At Wehrman's suggestion, and with his oversight, the Dickinsons began the demolition and reconstruction of part of their house in February 2000. The cost of the demolition and reconstruction was $731,833.50.
Before the demolition and reconstruction, no termite activity was reported and the moisture-content levels measured by Cook's in its annual inspections were never at or above 20% (a level of 20% or above would have indicated a greater chance of wood decay and insect infestation). During the demolition and reconstruction of the Dickinsons' house, however, Cook's discovered termite activity in the belowground wooden wall, which was located at the rear of the house.
After being informed by Cook's of the termite infestation, the Dickinsons hired a termite consultant to inspect their home. This consultant observed the termite infestation in the rear of the house and, after evaluating Cook's pretreatment of the Dickinsons' house, concluded that Cook's should have applied 600 to 700 gallons of the insecticide Dursban to the Dickinsons' house. The records maintained by Cook's reflect that it applied only 444 gallons of Dursban.
On December 21, 1999, following receipt of the Wehrman report, the Dickinsons sued Land Developers in the Shelby Circuit Court, seeking damages for breach of contract, fraud, mental anguish and emotional distress, negligent and/or wanton inspection, breach of the warranty of habitability, and breach of the implied warranty of merchantability arising from the construction of the Dickinsons' house. On October 27, 2000, the Dickinsons sued Cook's in the same court, seeking damages for breach of contract, fraud, negligence, and negligence per se arising out of termite damage to their house.
The actions were consolidated following a motion filed by the Dickinsons. Land Developers and Cook's both filed motions for a summary judgment; the trial court granted both motions, holding that the Dickinsons' claims against Land Developers and Cook's were time-barred.

II. Standard of Review
This Court's review of a trial court's ruling on a motion for a summary judgment is de novo, according to the following principles:
"`The standard of review applicable to a summary judgment is the same as the standard for granting the motion, that is, we must determine whether there was a genuine issue of material fact and, if not, whether the movant was entitled to a judgment as a matter of law. Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and resolve all reasonable doubts against the movant. Wilson v. Brown, 496 So.2d 756, 758 (Ala.1986); Harrell v. Reynolds Metals Co., 495 So.2d 1381 (Ala.1986). See also Hanners v. Balfour Guthrie, Inc., 564 So.2d 412 (Ala.1990).

*297 "`... Ala.Code 1975, § 12-21-12, mandates that the [nonmovant] meet [its] burden by "substantial evidence." Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989). Under the substantial evidence test the nonmovant must present "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989).'"
Parrish v. Blazer Fin. Servs., Inc., 868 So.2d 406, 409 (Ala.2003)(quoting Brewer v. Woodall, 608 So.2d 370, 372 (Ala.1992)).

III. Claims Against Land Developers
The issue in the Dickinsons' action against Land Developers is whether, when the record is reviewed in a light most favorable to the Dickinsons as the nonmovants, the Dickinsons' claims are time-barred. The Dickinsons concede that Ala.Code 1975, §§ 6-5-220 through 6-5-225 govern their claims against Land Developers. Section 6-5-221(a) provides:
"(a) All civil actions in tort, contract, or otherwise ... against builders who constructed, or performed or managed the construction of, an improvement on or to real property designed by and constructed under the supervision, administration, or observation of an architect or engineer, or designed by and constructed in accordance with the plans and specifications prepared by an architect or engineer, for the recovery of damages for:
"(i) Any defect or deficiency in the design, planning, specifications, testing, supervision, administration, or observation of the construction of any such improvement, or any defect or deficiency in the construction of any such improvement; or
"(ii) Damage to real or personal property caused by any such defect or deficiency; or
"(iii) Injury to or wrongful death of a person caused by any such defect or deficiency;

shall be commenced within two years next after a cause of action accrues or arises, and not thereafter."
(Emphasis added.)
Section 6-5-220(e) provides that a cause of action "accrues or arises"
"when a person is injured, including injury which results in death, or when property is damaged as a proximate result of a defect or deficiency in design, planning, testing, supervision, administration, or observation of construction of an improvement by an architect or engineer or in the construction of an improvement by an architect or engineer or in the construction of an improvement on or to real estate, constructed, performed, or managed by a builder; or where the damage or injury either is latent or by its nature is not discoverable in the exercise of reasonable diligence at the time of its occurrence, the claim for relief shall be deemed to arise or accrue at the time the damage or injury is or in the exercise of reasonable diligence should have been first discovered, whichever is earlier. The cause of action accrues or arises whether or not the full amount of damages is apparent at the time of the first injury or damage, and cannot be extended as a continuous wrong."
(Emphasis added.) Section 6-5-225 provides that, through the above-quoted sections, the Legislature intended to "apply[] for the first time to both these tort and contractual actions, the so-called `discovery *298 rule,'" where the injury or damage is latent.
The "discovery rule," found in Ala.Code 1975, § 6-2-3,[1] applies to fraud claims. See Sanders v. Peoples Bank & Trust Co., 817 So.2d 683, 686 (Ala.2001). We have held that "'"[t]he question of when a party discovered or should have discovered the fraud is generally one for the jury."'" Potter v. First Real Estate Co., 844 So.2d 540, 546 (Ala.2002) (quoting Ex parte Seabol, 782 So.2d 212, 216 (Ala.2000), quoting in turn Liberty Nat'l Life Ins. Co. v. Parker, 703 So.2d 307, 308 (Ala.1997)). However, a party will be deemed to have "discovered" a fraud as a matter of law upon the first of either the actual discovery of the fraud or when the party becomes privy to facts that would provoke inquiry in a reasonable person that, if followed up, would lead to the discovery of the fraud. Auto-Owners Ins. Co. v. Abston, 822 So.2d 1187, 1195 (Ala.2001); Gray v. Liberty Nat'l Life Ins. Co., 623 So.2d 1156, 1159 (Ala.1993). Under § 6-5-221(a) (read in conjunction with § 6-5-220(e) and § 6-5-225), we must apply these "discovery" principles to each of the Dickinsons' claims against Land Developers, not simply the fraud claims.
As stated above, the Dickinsons' asserted numerous claims against Land Developers: breach of contract, fraud, mental anguish and emotional distress, negligent and/or wanton inspection, breach of the warranty of habitability, and breach of the implied warranty of merchantability. However, the factual basis for each of these claims is the same: 1) that Land Developers made certain promises or representations to the Dickinsons, and 2) that there are numerous defects in the house. According to the Dickinsons, Land Developers' promises or representations were as follows:
"A. That [Land Developers] were good and competent contractors;
"B. That [Land Developers] would contract on behalf of the [Dickinsons] and hire subcontractors, materialmen, laborers, and others in order to secure completion of their home in a workmanlike manner ...;
"C. That the home would be built in accordance with the plans, specifications, and contract documents and that all work would be done in compliance with any and all applicable local building codes and the Southern Building Code;
"D. [Land Developers] promised and agreed to build the [Dickinsons'] home in the best possible manner and that [Land Developers] would provide [Land Developers'] best skill and attention in constructing and overseeing the construction of subcontractors on the [Dickinsons'] home;
"E. [Land Developers] represented to [the Dickinsons] that [Land Developers] had done all of the work in conformance with contract documents, plans, and specifications;
"F. [Land Developers] promised to repair and/or cure any and all faulty or defective work or failure of any workmanship or materials or equipment whether supplied by [Land Developers] or by subcontractors or materialmen hired by [Land Developers]."
Many of these promises or representations appear in the contract between the Dickinsons and Land Developers.
*299 According to the Dickinsons, the defects with the Dickinsons' house are as follows:
"a. Wood framing extends below grade around portions of the exterior perimeter of the house which was backfilled against with dirt which has caused severe structural rot and damage over a period of time.
"b. The backfill and/or fill dirt around the house, drains, walls, patios, and concrete floors was improperly impacted or improperly drained causing damage to said walls, patios and floors.
"c. There is no evidence of proper drainage around the perimeter of the house.
"d. There are a number of leaks in said home.
"e. The perimeter of most windows and doors were not properly sealed and/or supported.
"f. There are some locations where the base wood and concrete has suffered from structural failure and the damaged areas have telegraphed through the house causing floors to be unlevel, walls to be out of plumb doors and windows to `sink.'
"g. Improper backfill and/or fill was used on the entire home."
In entering a summary judgment for Land Developers, the trial court held that the Dickinsons either "discovered" all of these defects, or were "privy to facts that would `provoke inquiry in a [person] of reasonable prudence, and which, if followed up, would have led to the discovery'" of all of the defects, Auto-Owners, supra, 822 So.2d at 1195 (quoting Willcutt v. Union Oil Co., 432 So.2d 1217, 1219 (Ala.1983)), more than two years before they filed their complaint on December 21, 1999. We disagree with this holding in part.
The undisputed facts of this case show that the Dickinsons discovered a number of problems with their house at an early stage. The Dickinsons were aware of roof leaks and problems with the French doors and window seals as early as 1994. In 1995 the Dickinsons were informed of water damage in parts of their home, and they knew as early as March 3, 1995, that their pool bath was leaking. The Dickinsons' also learned as early as 1995 that their driveway was starting to crack and that it was always wet. Insofar as the Dickinsons' claims against Land Developers arise out of the above problems, they are barred by the two-year statutory limitations period of § 6-5-221, Ala.Code 1975.
Land Developers argues that all of the Dickinsons' problems put them on notice of facts that, if reasonably investigated, would have brought to their attention the rotten belowgrade wooden wall and the fill-soil compaction problems that caused the structural damage to their house. Land Developers correctly points out that the limitations period begins to run from the date damage is "discovered," without regard to whether the full extent of the damage is apparent at that time. See Ala.Code 1975, § 6-5-220(e). However, it is incorrect in its assertion that the various problems the Dickinsons were aware of in 1994 and 1995 were, as a matter of law, sufficient to "provoke inquiry in a [person] of reasonable prudence, and which, if followed up, would have led to the discovery," Auto-Owners, 822 So.2d at 1195  within the limitations period  of the fact that their house was resting in part on a rotten belowground wooden wall or that it had been constructed on allegedly improperly compacted fill soils. With respect to these "hidden" or latent defects, the issue is not whether the Dickinsons had general knowledge of problems with *300 the construction of the house or whether a reasonable person would have sought professional help in an attempt to discover the source of the problems and fix them; indeed, the Dickinsons did just that when they sought the assistance of Land Developers. Instead, the issue is whether Land Developers has produced sufficient evidence on which to hold as a matter of law that the problems listed above with the Dickinsons' house, of which the Dickinsons were aware shortly after the house was constructed, would have put a reasonable person (in the Dickinsons' situation as a home buyer) on notice that he should have 1) investigated the underground wooden wall and the fill-soil area himself, or 2) gone beyond seeking Land Developers' assistance in determining the source or sources of the problems and the proper way to fix those problems.
There is no evidence indicating that the Dickinsons had, or a reasonable person in the Dickinsons' position would have had, the inclination or the ability to perform a sufficient self-investigation. While there is some evidence indicating that the Dickinsons were put on notice that there was some belowground wood present at the home (through Cook's 1995 report), there is no evidence indicating that the Dickinsons knew that the belowground wooden wall existed or, more importantly, that any reasonable person would know that the presence of belowground wood was a problem at all. From the standpoint of a "reasonable person," it would appear that a myriad of causes could have been the source of the problems with the Dickinsons' French doors, driveway, and pool bath, and the Dickinsons tried several times to solve the problems with their house through Land Developers  the one entity that should have the most knowledge about the house.
The construction contract imposed on Land Developers a duty to repair any faulty or defective work. Pursuant to this contractual provision, the Dickinsons contacted Land Developers several times asking it to fix the problems the Dickinsons were experiencing with their house. We hold that the Dickinsons' reliance on Land Developers to fix their problems was reasonable. A reasonable person in the Dickinsons' situation would rely on Land Developers to fix the type of problems the Dickinsons were experiencing. A reasonable person would not pay to have a third party fix and diagnose problems with their house without first allowing their expert homebuilder to perform that duty  a duty that the homebuilder is generally required to perform.[2]
Land Developers has failed to show that the problems the Dickinsons experienced with their house shortly after construction was completed would cause a reasonable person to discover the existence of the rotten belowground wooden wall or the allegedly improperly compacted fill soil. In contrast, the Dickinsons have produced evidence indicating that they did not know of the serious structural damage to their house until Wehrman prepared his report in 1999. Therefore, the question of when the Dickinsons should have discovered the serious structural defects in their house, *301 such as the rotten belowground wall and the allegedly improperly compacted fill soil, may not be decided as a matter of law, and a jury question exists as to when the Dickinsons discovered facts sufficient to maintain their claims against Land Developers. Therefore, we reverse the trial court's summary judgment as to the Dickinsons' claims against Land Developers.

IV. Claims Against Cook's
The issue in the Dickinsons' action against Cook's is whether, viewing the record in a light most favorable to the Dickinsons, we would conclude that the trial court properly entered a summary judgment in favor of Cook's as to all of the Dickinsons' claims. We hold that the summary judgment for Cook's was proper.
The Dickinsons' first claim against Cook's alleges breach of contract. Specifically, the Dickinsons claim that Cook's breached its contract with them by failing to pretreat their home in 1993, failing to properly inspect their home during its annual inspections, failing to apply proper treatment pursuant to the contract between the Dickinsons and Cook's ("the termite contract"), failing to inform them of termite activity, and failing to repair termite damage to their house. The Dickinsons have conceded that their claim against Cook's for breach of the 1993 pretreatment contract is barred by the statute of limitations.
The trial court entered a summary judgment as to all of the Dickinsons' claims against Cook's because it held that the statutory limitations period had run as to each claim. While we affirm the trial court's summary judgment, we do so on different grounds; therefore, it is not necessary to address the statute-of-limitations issue. This Court can affirm a trial court's judgment for any reason, even one not considered by the trial court. Laidlaw Transit, Inc. v. Alabama Educ. Ass'n, 769 So.2d 872, 873 (Ala.2000).
The damage the Dickinsons allege in their complaint they suffered as a result of the actions of Cook's is limited to termite damage in the area in the rear of their house where the rotten belowground wooden wall was located. It is undisputed that the termite contract did not require Cook's to inspect or treat certain areas of the Dickinsons' house, including areas where:
"a. Wood members of the building are in direct contact with the ground.
"b. Wood material in the building is below outside finished ground level.
"c. A moisture problem exists which permits termites to survive without returning to the ground."
When interpreting a contract, this Court will reconcile and enforce all of its terms and will not ignore or disregard any term so long as doing so is not patently unreasonable. Yu v. Stephens, 591 So.2d 858 (Ala.1991). The evidence presented in this action established that at least two of the above exclusions to the termite contract were applicable to the area where the termite damage was allegedly discovered. Specifically, that area was an area where the wood was in direct contact with the ground and was below the outside finished ground level. Because the damage the Dickinsons sustained clearly fell within at least two of the exclusions listed in the termite contract, Cook's had no duty to inspect or treat the area or to repair the termite damage, and its failure to do so was not a breach of contract. Therefore, summary judgment was proper as to the Dickinsons' claim that Cook's breached the termite contract.
The Dickinsons also argue that Cook's breached their contract by failing to notify the Dickinsons that it had discovered termites on the premises. There is *302 no evidence to support this allegation. It is undisputed that neither Cook's nor anyone else discovered termites until the house was partially demolished in 2000, at which point Cook's promptly notified the Dickinsons of the termite infestation. Therefore, summary judgment was proper as to the Dickinsons' claim of breach of contract based on Cook's alleged failure to notify them of the termite infestation at their house.
The trial court also properly entered a summary judgment as to the Dickinsons' fraud claim against Cook's. There can be no fraud without a breach of a legal duty owed by the defendant to the plaintiff. George v. Federal Land Bank of Jackson, 501 So.2d 432, 435 (Ala.1986). As noted earlier, the termite damage to the Dickinsons' house was in areas that Cook's clearly had no duty to inspect, treat, or repair under the termite contract. Therefore, the Dickinsons' fraud claim against Cook's is without merit and a summary judgment as to that claim was proper.
Finally, the Dickinsons allege that Cook's was negligent in inspecting their property and in failing to inform them of termite damage, and that Cook's was negligent per se for failing to follow Ala.Code 1975, § 2-28-9. The trial court properly entered a summary judgment for Cook's as to these negligence claims.
"`The existence of a duty to the plaintiff is fundamental to a negligence claim.'" Patrick v. Union State Bank, 681 So.2d 1364, 1367 (Ala.1996) (quoting Graveman v. Wind Drift Owners' Ass'n, Inc., 607 So.2d 199, 203 (Ala.1992)). As stated earlier, Cook's had no duty under the termite contract to inspect, treat, or repair the areas where the termite damage was discovered. Therefore, the trial court properly entered a summary judgment for Cook's as to the Dickinsons' negligence claims.
The Dickinsons' claim that Cook's was negligent per se for violating Ala.Code 1975, § 2-28-9 is also without merit. To establish negligence per se, a plaintiff must prove: (1) that the statute the defendant is charged with violating was enacted to protect a class of persons to which the plaintiff belonged; (2) that the plaintiff's injury was the kind of injury contemplated by the statute; (3) that the defendant violated the statute; and (4) that the defendant's violation of the statute proximately caused the plaintiff's injury. Elder v. E.I. DuPont de Nemours & Co., 479 So.2d 1243, 1248 (Ala.1985).
Alabama Code 1975, § 2-28-9, requires persons engaged in termite eradication and control to make annual reports to the owner of the building where the termite-control work is being performed indicating whether there has been an infestation of termites.[3] The Dickinsons' own testimony *303 made clear that Cook's sent the Dickinsons reports of the annual inspections it performed on the Dickinsons' house. Therefore, the trial court's summary judgment for Cook's on the Dickinsons' claim of negligence per se was proper.

V. Conclusion
Based on the above, we reverse the trial court's summary judgment as to the Dickinsons' claims against Land Developers, insofar as those claims are based on the latent defects mentioned above: the belowground wooden wall and the fill-soil compaction. Otherwise, we affirm the trial court's summary judgment for Land Developers. We also affirm the trial court's summary judgment in favor of Cook's.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
SEE, LYONS, and WOODALL, JJ., concur.
HOUSTON and JOHNSTONE, JJ., concur specially.
HOUSTON, Justice (concurring specially).
I write specially to address a particular problem: the confusion surrounding the difference between a claim alleging breach of contract and a claim alleging fraud. There is a distinct difference between the two claims, but I fear that that distinction is all too often lost in Alabama. Simply put, a plaintiff cannot convert the mere failure to perform or to fulfill a contractual promise into a fraud claim, and that appears to be happening in this case.
Under Alabama law, a plaintiff can, in some instances, maintain a cause of action for fraud and breach of contract arising from the same general factual circumstances. See Deupree v. Butner, 522 So.2d 242 (Ala.1988). In Deupree, we held that the plaintiffs, who had signed a contract to purchase a Florida townhome from the defendant developer but had not yet closed on the townhome, could recover for both fraud and breach of contract based on the developer's representations to the plaintiffs that there would be no problems in acquiring the necessary governmental approval for a boat slip appurtenant to the property, when in fact there were substantial problems. 522 So.2d at 243-45. We held that there was evidence indicating that the plaintiffs would not have closed on the townhome had the defendant disclosed the truth about the governmental approval process, and we held that the plaintiff could recover for fraudulent suppression. 522 So.2d at 245. In reaching this holding, we also noted that a plaintiff can recover for both breach of contract and fraud when the plaintiff has been fraudulently induced (through false statements about specific facts) into making a contract:
"`There are a number of situations in our law whereby a plaintiff may derive benefits from a contract and yet still recover for tortious action concerning the contract, such as misrepresentation and deceit. There is a line of cases wherein the facts show misrepresentations concerning the goods that the buyer purchases; e.g., a buyer purchases a horse that the seller maintains has two good eyes, and the buyer later discovers that one of the eyes is blind. In this type of situation [fraudulent inducement], the buyer need not forgo the benefit received under the contract in order to sue for the misrepresentations. See Mutual Sav. Life Ins. Co. v. Osborne, 245 Ala. 15, 15 So.2d 713 (1943): Moore v. Oneonta Motor Company, 223 Ala. 510, 137 So. 301 (1931); Fairbanks, *304 Morse and Co. v. Dees, 220 Ala. 41, 126 So. 624 (1929).'"
Deupree, 522 So.2d at 244 (quoting National Sec. Fire & Cas. Co. v. Vintson, 414 So.2d 49, 50-51 (Ala.1982)). While the Deupree decision characterized the alleged fraud at issue in that case as fraudulent suppression, 522 So.2d at 244 ("[w]e hold that the fraud alleged in this case was not fraud in the inception of the contract, but in fraudulent concealments after the contract was made"), given the fact that the plaintiffs had not yet closed on their townhome and the fact that they alleged that they would not have closed on the townhome if they had not been lied to, the fraud alleged in Deupree appears to favor a claim for fraudulent inducement (to close on the townhome and "complete" the contract). Regardless, it is clear that to assert a fraud claim that stems from the same general facts as one's breach-of-contract claim, the fraud claim must be based on representations independent from the promises in the contract and must independently satisfy the elements of fraud. Deupree, 522 So.2d at 245.
However, it is a universally held principle that the "mere failure to perform a [contractual] promise does not constitute fraud." John Brown Automation, Inc. v. Nobles, 537 So.2d 614, 618 (Fla.Dist.Ct.App.1989). In fact, a party to a contract may intentionally, and even in bad faith (except in the insurance context), see American Cast Iron Pipe Co. v. Williams, 591 So.2d 854, 857 (Ala.1991), break a contractual promise without that action becoming a fraud or other tort. While perhaps we have not clearly described the difference between breach of contract and fraud, I find the following discussion from a Florida court to be very helpful and accurate:
"The appealed order was entered before the Florida supreme court issued its decision in HTP, Ltd. v. Lineas Aereas Costarricenses, S.A., 685 So.2d 1238 (Fla.1996). HTP emphasizes the distinctions between a suit for fraud in inducing the contract and a suit for breach of contract. The court explained these are two very different causes of action with separate and consistent remedies. 685 So.2d at 1239. The HTP court further explained the reason for retaining a cause of action for fraud in the inducement by quoting a widely cited Michigan case, Huron Tool and Eng'g Co. v. Precision Consulting Services, Inc., 209 Mich.App. 365, 532 N.W.2d 541, 545 (1995):
"`The distinction between fraud in the inducement and other kinds of fraud is the same as the distinction drawn by a New Jersey federal district court between fraud extraneous to the contract and fraud interwoven with the breach of contract. With respect to the latter kind of fraud, the misrepresentations relate to the breaching party's performance of the contract and do not give rise to an independent cause of action in tort.'
"Id. at 1240. If a fraud is perpetrated which induces someone to enter into a contract, there is a cause of action for fraud and the remedies attendant to that particular tort are available. If there is no fraud inducing someone to enter into a contract, but the contract is breached, the cause of action sounds in contract and contract remedies are available. The fact that the measure of damages may be the same for both causes of action does not make the fraud claim disappear. It is no more desirable to have tort law drown in a sea of contract than to have contract law drown in a sea of tort. The notion that a knowing fraud perpetrated to induce someone to enter into a contract can be extinguished by the simple expedience of including *305 the fraudulent representation in the contract makes no sense. The problem appears to be that there is a lot of loose language being used to describe these principles and the confusion is compounded with almost every case.
"What the above-quoted language from Huron Tool means is no mystery and is already explained in existing Florida law. John Brown Automation, Inc. v. Nobles, 537 So.2d 614 (Fla. 2d DCA 1988), review denied, 547 So.2d 1210 (Fla.1989). To understand it merely requires an appreciation of the distinction between fraud in the inducement and fraud in the performance of a contract. The New Jersey case referenced in the Huron Tool opinion is plainly a fraud in the performance case. Public Service Enterprise Group, Inc. v. Philadelphia Elec. Co., 722 F.Supp. 184, 201 (D.N.J.1989).
"A few examples may be helpful. Suppose someone offers to sell you a particular emerald for $5,000 and, in order to induce you to buy it, represents to you that it is `top quality' and that it has not been filled. You buy it based on the factual representation that the stone is unfilled but later you learn that it, in fact, had been filled. If the seller knew the emerald had been filled but lied in order to trick you into agreeing to buy it, you have a cause of action for fraud with all its attendant remedies. You may also have an action for breach of contract. The fact that the same measure of damages (the difference in value between a filled emerald and an unfilled emerald) may be available under both the tort and the breach of contract does not cause the tort to disappear. Nor does the inclusion of the fraudulent representation as an express warranty in the contract preclude the tort remedy.
"Suppose, on the other hand, on December 1, 1997, the same person enters into a contract with you pursuant to which, in exchange for your payment of $5,000, he will deliver to you on January 1, 1998 a `top quality,' unfilled emerald. If, on January 1, 1998, he instead delivers an emerald that has been filled, he has only breached the contract. It is immaterial whether, when he delivered the emerald on January 1, 1998, he knew the emerald was filled. This is breach of contract pure and simple and cannot be converted into a fraud. Nor is it a fraud if the emerald is not `top quality' because such a representation concerning the quality of the product is essentially opinion, not fact, and the characteristics of the product are a matter that the parties can expect to control by contract. HTP at 1240. The essential difference lies in the nature of fraud itself, which is a knowing false statement of fact made with the intent that it cause action in reliance and it does cause such action to the detriment of the victim of the knowing false statement. In a fraud in the inducement situation, if there is damage based on a decision to contract that would otherwise not be made, a cause of action for fraud exists. There isn't necessarily damage where there is fraud, which is why no cause of action for fraud exists unless there is damage due to fraud that is separate from damages that may result from any subsequent contractual breach. This principle has nothing to do with the economic loss rule. The economic loss rule does not preclude a tort claim which is based on conduct which is separate and distinct from conduct constituting a breach of contract, if the fraud itself causes damage."
La Pesca Grande Charters, Inc. v. Moran, 704 So.2d 710, 712-13 (Fla.Dist.Ct.App.1998) (footnotes omitted).
*306 The difficulty with the Dickinsons' fraud claims is not only that they are unclear as to what type of fraud they assert was committed, but also that the claims appear, to a great degree, to sound in breach of contract, not fraud. For example, count one of the Dickinsons' complaint (titled "Fraud") states:
"8. At the time the home was constructed by [Land Developers], representations were made to [the Dickinsons] as set out in paragraph 5.... [These representations are quoted above in Part III of the main opinion as A. through F., 882 So.2d at 298.] Said representations were false and [Land Developers] knew they were false. [Land Developers] intentionally suppressed the fact that the construction was not done pursuant to the contract documents which caused the home to have numerous defects and which [Land Developers] knew or should have known. Among said defects are the following which [Land Developers] knew or should have known: [Here appears the Dickinsons' list of defects that is quoted above in Part III of the main opinion as a. through g.].
"9. [The Dickinsons] believed the said representations, reasonably relied on them, and innocently acted upon them to their detriment by having their home constructed by [Land Developers] and by paying [Land Developers] for improper and defective work."
Many, if not all, of the representations listed in A. through F. in Part III of the main opinion, 882 So.2d at 298, appear to be purely contractual promises, such as: Land Developers' promises to hire "competent subcontractors," to work in a "workmanlike manner," and to build the home in "the best possible manner" and "in accordance with the ... contract documents." The argument that these promises can support an independent fraud claim, rather than only a breach-of-contract claim, seems difficult, if not impossible, to maintain when merely based upon the allegation that the house was not built in a "workmanlike manner" or "in accordance with the contract documents."
The Dickinsons' other count alleging fraud, count three ("Fraudulent Inducement"), appears to suffer from the same problems in that the allegations appear to be based on the claim that Land Developers did not perform in accordance with the contract:
"15. [The Dickinsons] aver that [Land Developers] represented to [the Dickinsons] that their home would be delivered to them free from defects and if there were defects, the said defects would be promptly cured.
"16. In fact, the home was not free from defects, was not fit for its ordinary and particular uses, and the defects have not been cured despite repeated assurances that they would be.
"17. The representations above, which were made to [the Dickinsons], were in fact false and fraudulent. Said representations made by [Land Developers] induced them to enter a contract with said [Land Developers]. They were in fact relied upon by [the Dickinsons] in purchasing and contracting with [Land Developers] to construct their home. [Land Developers] intended that [the Dickinsons] should rely on said false representations."
This claim is unlike the fraud alleged in Deupree, where an independent misrepresentation about a specific material fact compelled the plaintiffs to go through with a closing that would otherwise not have been completed.
While Land Developers' motion for a summary judgment was predicated solely on the two-year limitations period in § 6-5-221(a), *307 it is well established that "this Court can affirm the ruling of a trial court for any valid reason, even one not presented to or considered by the trial court." Southern Energy Homes, Inc. v. Gregor, 777 So.2d 79, 81 (Ala.2000) (citing Smith v. Equifax Servs., Inc., 537 So.2d 463 (Ala.1988)). For the reasons stated above, I have serious reservations about the Dickinsons' fraud claims, and I am tempted to recommend that this Court affirm the trial court's ruling with respect to some or all of those claims. However, I believe that in this case it is appropriate to allow the trial court the first opportunity to examine the issue.
JOHNSTONE, Justice (concurring specially).
I concur fully in the main opinion. I add some observations of my own.
While some of the alleged promises or representations the Dickinsons attribute to Land Developers may be mere contractual agreements that will support only contract claims, others would support fraud claims. For instance, if, as alleged, "[Land Developers falsely] represented to [the Dickinsons] that [Land Developers] had done all of the work in conformance with contract documents, plans, and specifications," in order to induce the Dickinsons to make payments on the contract that would be due only if the work were, in fact, done "in conformance with the contract documents, plans, and specifications," and if, as alleged, the Dickinsons "believed the said representations, reasonably relied on them, and innocently acted on them to their detriment by ... paying [Land Developers] for improper and defective work," all of the classic essential elements of fraud would be present. See Crowder v. Memory Hill Gardens, Inc., 516 So.2d 602, 604 (Ala.1987) ("The elements of an actionable fraudulent representation are 1) a false representation 2) concerning a material existing fact, which was 3) [reasonably] relied upon by the plaintiff 4) to his detriment.").
NOTES
[1] Ala.Code 1975, § 6-2-3, provides:

"In actions seeking relief on the ground of fraud where the statute has created a bar, the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action."
[2] At some point, after numerous failed attempts by the homebuilder to fix problems, a reasonable person in this situation would seek assistance from another expert (as the Dickinsons eventually did in 1999). Such numerous failed attempts could make a home buyer "privy to facts that would `provoke inquiry in a [person] of reasonable prudence, and which, if followed up, would have led to the discovery'" of the true source of the defects. Auto-Owners, supra, 822 So.2d at 1195. However, we cannot say as a matter of law that, in this case, a reasonable person would have sought such outside assistance sooner than did the Dickinsons.
[3] Ala.Code 1975, § 2-28-9, provides:

"Persons engaged in subterranean termite eradication and control work shall be required to file a monthly report with the commissioner containing such information relative to work performed as may be required by rules and regulations duly adopted as authorized under provisions of this chapter in order that it may be determined whether persons having been issued a permit are complying with the requirements of this chapter. Every person engaged in subterranean termite eradication and control work shall make an annual inspection of each job done during the term of the contract and shall report to the building owner in each instance as to whether or not there has been a reinfestation of subterranean termites. If a contract for termite eradication work provides for inspections of such work at intervals of less than one year, such inspections shall be made as required by the terms of the contract, and failure or refusal to make such required inspections or any retreatment or other related work as required by a contract shall constitute a valid and sufficient reason for revocation of the permit."