I concur with the majority's opinion that the State of Alabama did not prove the "reasonable reliance" element of its fraud claim. However, I write specially to note that even if there had been evidence of reliance, there would still be many problems with the trial court's judgment against Hunt, mostly stemming from a problem that permeates this case and many other cases: a misunderstanding of *Page 10 
the fundamental difference between claims of breach of contract and claims of fraud.
I recently discussed the difference between breach-of-contract and fraud claims in my special concurrence in Dickinson v. LandDevelopers Construction Co., 882 So.2d 291 (Ala. 2003):
 "I write specially to address a particular problem: the confusion surrounding the difference between a claim alleging breach of contract and a claim alleging fraud. There is a distinct difference between the two claims, but I fear that that distinction is all too often lost in Alabama. Simply put, a plaintiff cannot convert the mere failure to perform or to fulfill a contractual promise into a fraud claim, and that appears to be happening in this case.
 "Under Alabama law, a plaintiff can, in some instances, maintain a cause of action for fraud and breach of contract arising from the same general factual circumstances. See Deupree v. Butner, 522 So.2d 242 (Ala. 1988). In Deupree, we held that the plaintiffs, who had signed a contract to purchase a Florida townhome from the defendant developer but had not yet closed on the townhome, could recover for both fraud and breach of contract based on the developer's representations to the plaintiffs that there would be no problems in acquiring the necessary governmental approval for a boat slip appurtenant to the property, when in fact there were substantial problems. 522 So.2d at 243-45. We held that there was evidence indicating that the plaintiffs would not have closed on the townhome had the defendant disclosed the truth about the governmental approval process, and we held that the plaintiff could recover for fraudulent suppression. 522 So.2d at 245. In reaching this holding, we also noted that a plaintiff can recover for both breach of contract and fraud when the plaintiff has been fraudulently induced (through false statements about specific facts) into making a contract:
 "`"There are a number of situations in our law whereby a plaintiff may derive benefits from a contract and yet still recover for tortious action concerning the contract, such as misrepresentation and deceit. There is a line of cases wherein the facts show misrepresentations concerning the goods that the buyer purchases; e.g., a buyer purchases a horse that the seller maintains has two good eyes, and the buyer later discovers that one of the eyes is blind. In this type of situation [fraudulent inducement], the buyer need not forgo the benefit received under the contract in order to sue for the misrepresentations. See Mutual Sav. Life Ins. Co. v. Osborne, 245 Ala. 15, 15 So.2d 713 (1943); Moore v. Oneonta Motor Company, 223 Ala. 510, 137 So. 301
(1931); Fairbanks, Morse and Co. v. Dees, 220 Ala. 41, 126 So. 624 (1929)."'"
Deupree, 522 So.2d at 244 (quoting National Sec. Fire Cas.Co. v. Vintson, 414 So.2d 49, 50-51 (Ala. 1982)). While theDeupree decision characterized the alleged fraud at issue in that case as fraudulent suppression, 522 So.2d at 244 (`[w]e hold that the fraud alleged in this case was not fraud in the inception of the contract, but in fraudulent concealments after the contract was made'), given the fact that the plaintiffs had not yet closed on their townhome and the fact that they alleged that they would not have closed on the townhome if they had not been lied to, the fraud alleged in Deupree appears to favor a claim for fraudulent inducement (to close on the townhome and `complete' the contract). Regardless, it is clear that to asserta fraud claim that stems from the same *Page 11 general facts as one's breach-of-contract claim, the fraud claimmust be based on representations independent from the promises inthe contract and must independently satisfy the elements offraud. Deupree, 522 So.2d at 245.
"However, it is a universally held principle that the `mere failure to perform a [contractual] promise does not constitute fraud.' John Brown Automation, Inc. v. Nobles, 537 So.2d 614,618 (Fla.Dist.Ct.App. 1989). In fact, a party to a contract mayintentionally, and even in bad faith (except in the insurance context), see American Cast Iron Pipe Co. v. Williams,591 So.2d 854, 857 (Ala. 1991), break a contractual promise withoutthat action becoming a fraud or other tort. While perhaps we have not clearly described the difference between breach of contract and fraud, I find the following discussion from a Florida court to be very helpful and accurate:
 "`The appealed order was entered before the Florida supreme court issued its decision in HTP, Ltd. v. Lineas Aereas Costarricenses, S.A., 685 So.2d 1238
(Fla. 1996). HTP emphasizes the distinctions between a suit for fraud in inducing the contract and a suit for breach of contract. The court explained these are two very different causes of action with separate and consistent remedies. 685 So.2d at 1239. The HTP court further explained the reason for retaining a cause of action for fraud in the inducement by quoting a widely cited Michigan case, Huron Tool and Eng'g Co. v. Precision Consulting Services, Inc., 209 Mich.App. 365, 532 N.W.2d 541, 545 (1995):
 "`"The distinction between fraud in the inducement and other kinds of fraud is the same as the distinction drawn by a New Jersey federal district court between fraud extraneous to the contract and fraud interwoven with the breach of contract. With respect to the latter kind of fraud, the misrepresentations relate to the breaching party's performance of the contract and do not give rise to an independent cause of action in tort."
 "`Id. at 1240. If a fraud is perpetrated which induces someone to enter into a contract, there is a cause of action for fraud and the remedies attendant to that particular tort are available. If there is no fraud inducing someone to enter into a contract, but the contract is breached, the cause of action sounds in contract and contract remedies are available. The fact that the measure of damages may be the same for both causes of action does not make the fraud claim disappear. It is no more desirable to have tort law drown in a sea of contract than to have contract law drown in a sea of tort. The notion that a knowing fraud perpetrated to induce someone to enter into a contract can be extinguished by the simple expedience of including the fraudulent representation in the contract makes no sense. The problem appears to be that there is a lot of loose language being used to describe these principles and the confusion is compounded with almost every case.
 "`What the above-quoted language from Huron Tool
means is no mystery and is already explained in existing Florida law. John Brown Automation, Inc. v. Nobles, 537 So.2d 614 (Fla. 2d DCA 1988), review denied, 547 So.2d 1210 (Fla. 1989). To understand it merely requires an appreciation of the distinction between fraud in the inducement and fraud in the performance of a contract. The New Jersey case referenced in the Huron *Page 12 Tool opinion is plainly a fraud in the performance case. Public Service Enterprise Group, Inc. v. Philadelphia Elec. Co., 722 F.Supp. 184, 201
(D.N.J. 1989).
 "`A few examples may be helpful. Suppose someone offers to sell you a particular emerald for $5,000 and, in order to induce you to buy it, represents to you that it is "top quality" and that it has not been filled. You buy it based on the factual representation that the stone is unfilled but later you learn that it, in fact, had been filled. If the seller knew the emerald had been filled but lied in order to trick you into agreeing to buy it, you have a cause of action for fraud with all its attendant remedies. You may also have an action for breach of contract. The fact that the same measure of damages (the difference in value between a filled emerald and an unfilled emerald) may be available under both the tort and the breach of contract does not cause the tort to disappear. Nor does the inclusion of the fraudulent representation as an express warranty in the contract preclude the tort remedy.
 "`Suppose, on the other hand, on December 1, 1997, the same person enters into a contract with you pursuant to which, in exchange for your payment of $5,000, he will deliver to you on January 1, 1998 a "top quality," unfilled emerald. If, on January 1, 1998, he instead delivers an emerald that has been filled, he has only breached the contract. It is immaterial whether, when he delivered the emerald on January 1, 1998, he knew the emerald was filled. This is breach of contract pure and simple and cannot be converted into a fraud. Nor is it a fraud if the emerald is not "top quality" because such a representation concerning the quality of the product is essentially opinion, not fact, and the characteristics of the product are a matter that the parties can expect to control by contract. HTP at 1240. The essential difference lies in the nature of fraud itself, which is a knowing false statement of fact made with the intent that it cause action in reliance and it does cause such action to the detriment of the victim of the knowing false statement. In a fraud in the inducement situation, if there is damage based on a decision to contract that would otherwise not be made, a cause of action for fraud exists. There isn't necessarily damage where there is fraud, which is why no cause of action for fraud exists unless there is damage due to fraud that is separate from damages that may result from any subsequent contractual breach. This principle has nothing to do with the economic loss rule. The economic loss rule does not preclude a tort claim which is based on conduct which is separate and distinct from conduct constituting a breach of contract, if the fraud itself causes damage.'
 "La Pesca Grande Charters, Inc. v. Moran, 704 So.2d 710, 712-13 (Fla.Dist.Ct.App. 1998) (footnotes omitted)."
882 So.2d at 303-05 (Houston, J., concurring specially) (some emphasis original; some emphasis added).
In other words, a fraud claim cannot be maintained simply because a party — even mistakenly, intentionally, or maliciously — did not properly perform a contractual obligation. Additionally, not all "fraudulent" acts, as the term "fraudulent" is broadly understood, give rise to a cause of action for fraud. Fraud, as a cause of action, requires some damage stemming from reliance on a misrepresentation or suppression *Page 13 
intended to induce that reliance, i.e., reliance that caused someone to act or to refrain from acting. Deupree v. Butner,522 So.2d 242 (Ala. 1988),[9] discussed more fully in the above quotation, is the case most frequently cited — and is in fact cited by the State in this case — for the proposition that a party can maintain an action for both fraud and breach of contract stemming from the same set of operative facts. PerhapsDeupree is the case that initiated the current misunderstanding between breach of contract and fraud; if so, let this writing assist in ending it. Deupree does not stand for the proposition that one can maintain a fraud claim based merely on an alleged misrepresentation that, or suppression of the fact that, a party has not properly performed, or has intentionally not performed, a contractual obligation. Deupree involved "a knowing false statement of fact made with the intent that itcause action in reliance and it [did] cause such action to thedetriment of the victim of the knowing false statement." LaPesca Grande Charters, Inc. v. Moran, 704 So.2d 710, 713
(Fla.Dist.Ct.App. 1998) (emphasis added).
As described in the majority opinion, the dispute in this case primarily surrounds the interpretation of a contract — the lease agreement between Hunt and the State of Alabama — pursuant to which Hunt is to pay royalties on gas as follows:
 "5. When production of oil, gas or any other liquid or gaseous hydrocarbon mineral from the leased area is obtained, [Hunt] agrees to pay or cause to be paid to [the State], during the term hereof, the following royalties:
 "(a) The value of 16-2/3% until payout, thereafter 25% of the gross proceeds from all oil, distillate, condensate, gas, natural gasoline, or other product covered by this lease, produced and sold from the leased area at the price received therefor or at the best price realizable in the exercise of reasonable diligence, whichever is higher; however, if any oil or gas is produced from any well drilled, whether or not sold or used off the leased area, [Hunt] agrees to pay to [the State] royalty on the oil or gas produced on the above basis, except that no royalty shall be due for gas produced and flared for well testing purposes."
(Some emphasis original; some emphasis added.) Under this provision, the gas is to be valued, for purposes of calculating royalties, at "the leased area." Hunt contends that it interpreted this provision to mean that the gas should be valued at the "wellhead," i.e., where the impure gas comes out of the ground, thus allowing Hunt to deduct certain processing and transportation costs incurred before the gas reaches the "tailgate" (from which it is eventually sold) in order to compute the gross value of the gas "at the wellhead." The State contends that "gross proceeds" are to be measured "at the tailgate," and that Hunt did not properly report or pay royalties on the gas it sold. This dispute forms the context for the State's claims of fraud based on "improper deductions."
Additionally, the State contends that Hunt failed to properly report and pay royalties on "full-well-stream" volumes of gas and that Hunt was, instead, paying on lesser "off-separator" volumes. This forms the basis of the State's "unpaid volumes" claim. *Page 14 
The trial court, by entering a partial summary judgment in favor of the State on its contract claim, held that the lease agreement was "clear and unambiguous" and that Hunt had breached the lease agreement as to both the "improper deductions" claim and the "unpaid volumes" claim. Hunt does not appeal this ruling; that ruling, therefore, is now "the law of the case."[10]
See Yates v. El Bethel Primitive Baptist Church, 847 So.2d 331,333 (Ala. 2002). Following a trial, the jury found that Hunt's activities with regard to its reporting of royalties constituted fraud and awarded the State compensatory and punitive damages.
Much of the State's evidence in this case is directed at showing that Hunt's interpretation of the above-quoted provision of the lease agreement is incorrect — even unreasonable or impossible — and that, therefore, Hunt was not paying royalties in accordance with that provision. The State continually points to the following as evidence of Hunt's allegedly fraudulent activities: (1) Hunt officials meeting to discuss whether certain deductions were allowed and Hunt's decision to take an "aggressive position" with respect to the deductions Hunt thought it could take "without risking the lease"; (2) the testimony of the State's experts that Hunt's interpretation of the lease agreement was wrong or even impossible; (3) Hunt's failure to inform the State (before the audit) of its interpretation of the lease agreement and, accordingly, the manner in which it was calculating royalties;[11] (4) Hunt's failure to properly attach an affidavit to the monthly royalty reports as required by the lease agreement; and (5) the fact that the lease agreement requires that "[i]n case of ambiguity, this lease always shall be construed in favor of [the State] and against [Hunt]."[12]
Perhaps when viewed in a vacuum *Page 15 
this evidence would make Hunt's breach of contract more obvious and easier to prove, but it would not, by itself, support the State's fraud claim. "[A] party to a contract may intentionally, and even in bad faith (except in the insurance context), seeAmerican Cast Iron Pipe Co. v. Williams, 591 So.2d 854, 857
(Ala. 1991), break a contractual promise without that action becoming a fraud or other tort." Dickinson, 882 So.2d at 304
(Houston, J., concurring specially). However, we cannot view this evidence in a vacuum; rather, we must view this evidence in the context of all the evidence placed before the jury with a focus on any evidence from which the jury could have determined that Hunt knew what the State intended by the term "gross proceeds" in the lease agreement (i.e., that it was to be evaluated at the tailgate, not at the wellhead) and yet attempted to deceive the State into believing (and then into acting or refraining from acting in reliance on the belief) that what Hunt was submittingwas in accordance with the State's understanding of thatterm.[13] I make the above points only to help differentiate where breach of contract ends and fraud begins.
Given these principles, even if the State had demonstrated "reasonable reliance" — which it did not — I would still have problems with the trial court's judgments regarding the State's two fraud claims. First, I believe that the trial court clearly erred in denying Hunt's motion for a judgment as a matter of law with respect to the "unpaid volumes" claim. Furthermore, while the State's "improper deductions" claim presents a closer case, I can say with confidence that 1) there can be no fraud damages beyond August 1997, and 2) there was no "clear and convincing" evidence of intentional fraud sufficient to impose punitive damages under Ala. Code 1975, § 6-11-20.
 I. "Unpaid volumes" claim
The State contends that there was substantial evidence indicating that Hunt misrepresented its monthly "total gas produced" figures. I disagree. Substantial evidence is more than "any evidence," and I do not believe that there is substantial evidence of an intent on Hunt's part to deceive the State as to this claim.
Hunt reported its gas volumes based on figures provided to it by Exxon, its partner in this joint venture. The State's own auditors found as follows:
 "The volumes stated [in Hunt's reporting forms] agreed with the volumes supplied by Exxon and the method of calculating the Hunt reported volumes was correct and well documented.
". . . .
 "Exxon appears to have reported to Hunt . . . volumes from the Exxon plant inlet meter rather than from the true *Page 16 
lease volume. The State should request Exxon to restate their royalty volumes to reflect the platform production volumes at the tailgate of the platform. The royalties due the State will be increased. . . . The auditors feel that Hunt should not be responsible for the increase until Exxon is required to correct the reported platform volumes."
(Emphasis added.)
There was no evidence indicating that the State's auditors were wrong or that Hunt's numbers were not based upon the numbers it received from Exxon. At trial, the State conceded that Hunt had reported its volumes based on numbers Hunt had received from Exxon, and that, in fact, for that reason, Hunt had actuallyover-reported its volumes in some months. The State conceded that the differences between the two measurements were less than three-quarters of one percent. Hunt acknowledges that it can be contractually liable for underpayment of royalties arising from using volumes measured at the wrong meter (even though it had not received the correct information from Exxon), but it argues that, given these facts, Hunt cannot be liable for intentional fraud for having accurately represented to the State the volume figures it had been provided by Exxon.
The State does not dispute that Exxon did, in fact, report to Hunt the volume numbers relied on by Hunt; it argues only that an intent to deceive can be inferred from other records in Hunt's possession containing the actual full-well-stream volumes and from one report showing full-well-stream volumes, which had handwritten notes comparing the off-separator volumes reported by Exxon to Hunt and the full-well-stream volumes. While the slight differences between full-well-stream volumes and the off-separator volumes may be due the State as damages for breach of contract, I do not believe, especially in light of the State's audit report and the concessions made by the State noted above, that this is "substantial evidence" indicating that Hunt intended to deceive the State when it made its monthly reporting of total gas volumes. It may be an under-reporting (i.e., a breach of contract), but I do not think there was sufficient evidence ofintentional misrepresentation to send this fraud claim to the jury. See generally Fisher v. Comer Plantation, Inc.,772 So.2d 455, 463-64 (Ala. 2000) (discussing Speigner v. Howard,502 So.2d 367 (Ala. 1987), and the principle that "those who are only conduits through which faulty information is supplied by one person to a third person cannot be held liable for fraud unless they acted in bad faith").
 II. No Possible Fraud Damages after August 1997
Even if the trial court had been correct (and it was not) in sending the State's "improper deductions" fraud claim to the jury, I believe that it is clear that the award of damages for fraud for the period following the State's audit was improper. The evidence from the record is absolutely clear that following the August 1997 audit the State became fully aware of Hunt's method of calculating its royalty payments. It is axiomatic that full knowledge that a representation is a misrepresentation, or that a fact has been suppressed, ends any reasonable reliance on that misrepresentation or suppression, i.e., a party cannot reasonably rely on a known fraud. Shades Ridge Holding Co. v.Cobbs, Allen Hall Mortgage Co., 390 So.2d 601, 611 (Ala. 1980) ("`The idea of a person knowing a representation to be false and at the same time "relying" thereon is a contradiction in terms.'" (quoting Fowler V. Harper Fleming James, Jr., The Law ofTorts § 7.13 (1956))). Even if the State had not had the type of specific knowledge provided *Page 17 
by the audit process, the State had certainly "discovered" the fraud under Alabama law, which deems a fraud to be "discovered" when a plaintiff is
 "privy to facts which would `provoke inquiry in the mind of a [person] of reasonable prudence, and which, if followed up, would have led to the [actual] discovery of the fraud.' Willcutt v. Union Oil Co., 432 So.2d 1217, 1219 (Ala. 1983) (quoting Johnson v. Shenandoah Life Ins. Co., 291 Ala. 389, 397, 281 So.2d 636 (1973)); see also Jefferson County Truck Growers Ass'n v. Tanner, 341 So.2d 485, 488 (Ala. 1977) (`Fraud is deemed to have been discovered when it ought to have been discovered. It is sufficient to begin the running of the statute of limitations that facts were known which would put a reasonable mind on notice that facts to support a claim of fraud might be discovered upon inquiry.')."
Auto-Owners Ins. Co. v. Abston, 822 So.2d 1187, 1195 (Ala. 2001). Here, the State's knowledge in August 1997 was complete or was certainly sufficient to end any "reasonable" reliance on "misrepresentations" occurring after August 1997; indeed, it is undisputed that, as of that date, the State was well aware of how Hunt was calculating royalties (as well as how Hunt was calculating the total gas volumes).
As a matter of law, reasonable reliance — and, correspondingly, any damages for fraud — ended in August 1997.[14] SeeWaddell Reed, Inc. v. United Investors Life Ins. Co.,875 So.2d 1143, 1160 (Ala. 2003) (holding that initial reliance on alleged misrepresentations ceases to be reasonable when the person relying on them becomes aware that the representations were false). The trial court erred in allowing the jury to assess damages for fraud extending beyond August 1997.
 III. The Lack of "Clear and Convincing Evidence" of Fraud
Alabama Code 1975, § 6-11-20(a), provides that punitive damages can be assessed against a defendant only when the plaintiff has proven by "clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff." (Emphasis added.) Through § 6-11-20, the Legislature has set the burden of proof for determining punitive damages rather high; a party can prove fraud by "substantial evidence" without having the "clear and convincing evidence" described in the statute as necessary to justify punitive damages in a fraud action.
Under this statute, fraud is defined as "[a]n intentional misrepresentation, deceit, or concealment of a material fact the concealing party had a duty to disclose, which was gross,oppressive, or malicious and committed with the intention on the part of the defendant of thereby depriving a person or entity of property or legal rights or otherwise causing injury." Ala. Code 1975, § 6-11-20(b)(1) (emphasis added). It is important to note that the statute requires the intentional misrepresentation or deceit to be "gross, oppressive, or malicious,"[15] which heightens the burden of *Page 18 
proof necessary to impose punitive damages. Furthermore, "clear and convincing" is defined as:
 "Evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt."
Ala. Code 1975, § 6-11-20(b)(4) (emphasis added). The phrase "when weighed against evidence in opposition" is very important. Unlike the typical review of a judgment based on a jury verdict where we must, as the jury may, disregard evidence submitted by the defendant when that evidence is disputed, when evaluating the propriety of punitive damages under Ala. Code 1975, § 6-11-20, we are required to weigh the conflicting evidence.
In this case, even if the evidence were sufficient to submit the State's "improper deductions" fraud claim to the jury, I do not believe that there was "clear and convincing evidence" of such fraud to warrant the imposition of punitive damages under Ala. Code 1975, § 6-11-20. I believe that, in the context of this case, "clear and convincing evidence" requires something in the nature of direct evidence, or overwhelming indirect evidence, from which it is clear that Hunt, with some certainty, (1)knew of the State's interpretation of the lease agreement, (2)knew that it had no legitimate contractual interpretation issues, and (3) knew that it was "cheating" the State and tried to cover it up. In other words, in the context of this case, the State needed to present some very strong evidence indicating that Hunt was not acting simply as a business trying to maximize its profits by taking a position as "aggressive" as possible on the interpretation of a contract provision.[16]
Here, however, the only evidence submitted by the State that could allow the jury to reasonably infer an intent on Hunt's part to deceive was indirect evidence and the possible inferences to be drawn from that evidence. There is no direct evidence in the record indicating that Hunt ever represented that it was, in fact, paying royalties based on the "tailgate value" (i.e., knowingly in accordance with the State's interpretation of the lease agreement, which the trial court eventually endorsed) or that it knew, with some certainty, that its interpretation of the provision in the lease agreement was impossible. Rather, all of Hunt's actions can be seen as consistent with its alleged interpretation of the "gross proceeds" language (as being "gross proceeds from the wellhead"), including internal memoranda. Also, it is undisputed (1) that there was no artificially inflating or deflating of numbers or tampering with any devices, meters, or other gas-measuring equipment in any way; (2) that the lease agreement — which the State admits, and in fact argues, is "unique" — had never been interpreted when Hunt began to make payments; (3) that calculating back to the "wellhead value" (wherein "gross proceeds" from the wellhead would be a net figure) was not something Hunt created, but was extremely common in the oil and gas industry; (4) that before Hunt began paying royalties, *Page 19 
Michael Early, Hunt's accounting official, wrote the State requesting forms and other instructions on how to calculate and report the royalties, but the State informed him that it had no such information; and (5) that the State was planning to audit Hunt regardless of its actions in reporting royalties,[17]
and Hunt knew that the State was going to perform that audit.
Additionally, there is no evidence indicating that during the audit — or at any other time when asked by the State — Hunt tried to conceal its method of paying royalties or otherwise to thwart the auditing process. Instead, the undisputed evidence indicates quite the opposite: that Hunt fully complied with the auditors' requests and completely disclosed its method of calculating royalty payments. As noted above, with regard to the volume reporting the State's audit report reads:
 "The volumes stated [in Hunt's reporting forms] agreed with the volumes supplied by Exxon and the method of calculating the Hunt reported volumes was correct and well documented."
(Emphasis added.) In a letter to Hunt following the audit, the State wrote that "[t]he audit was conducted by Jerry Stokes of George Kaess and Associates and Frank Snyder of the Department of Conservation and Natural Resources, who wish to express their appreciation for the cooperation and assistance extended by the Hunt personnel during the audit." In fact, while the lease agreement requires records necessary for an audit to be kept for only two years, Hunt voluntarily kept those records for a much longer period, so that more records than necessary under the lease agreement were available for the audit.
Furthermore, at various times Hunt met with and consulted with other oil companies in an attempt to determine whether certain deductions were allowed under the lease agreement. The State does not dispute this evidence; in fact, it constituted much of the State's argument. The problem is that the evidence cuts against the notion that Hunt was clearly intending to deceive the State in a "gross, oppressive, and malicious" way, and instead paints a picture of a business attempting to maximize its profits through deductions it believes — rightly or wrongly — are arguably permissible deductions under the lease agreement. These events can be summarized as follows.
In June 1994, Hunt instructed two of its employees to contact other gas producers who had also entered into lease agreements with the State for extracting gas from offshore wells and to determine what, if any, deductions those producers were taking when calculating the monthly royalty they owed to the State. About this same time, Hunt executives determined that Hunt should have been deducting $.50 per MCF (thousand cubic feet) rather than $.78 per MCF it had been deducting. The $.50 per MCF expenses included a $.17 per MCF Transco transportation fee, a $.06 per MCF Exxon transportation fee, and a $.27 Mobil transportation and processing fee, but no longer included the Exxon transportation fee or the $.11 per MCF pipeline depreciation expense. The change in the correct calculation of the gathering and treating costs meant that Hunt had underpaid prior royalties to the State. From November 1993 through April 1994, the total underpayment was $249,000, as calculated by Hunt. Hunt refunded *Page 20 
this $249,000 to the State when Hunt received an audit notice.
On August 24, 1994, the controller of Hunt, Terry Morris, prepared a memorandum for Frank Howell, the senior vice president of oil and gas for Hunt, and copied the memorandum to senior Hunt executives, including revenue accounting supervisor Michael Early, manager of oil and gas production Bob Luttrell, vice president and the general counsel Andrew McCullough, and director of internal audit Scott Rushbrook. The memorandum stated, in pertinent part:
 "RE: Calculation of Alabama Royalty on Mobile Bay Production
 "The Alabama royalty on our Mobile Bay production is 18.5% of sales less (possible) deductions. The 18.5% is a blended rate of 22% of Tract 113 at 25% and 78% of Tract 114 at 16.67%. Whether any deductions are allowed is the question at hand.
 "The magnitude of the question appears to be about $5 million: Gross production of 50 MMCF/day x 365 days = 18,250 MMCF/year x our 25% share = 4,550 MMCF/year for us x .33/MCF possibly deductible expenses x 18.5% royalty = $278,000 potential difference in royalty x 25 years = $7 million. If the $.1541 MMBTU (approximately $.17/MCF) Transco fee is considered to be questionable also, the potential difference is $10.5 million.
". . . .
 "On June 23, all of the above addressees except Steve, Dave, Scott and me (per Mike's recollection) met. Mike passed out a copy of his and Meghan's recap of their conversation with personnel at Mobil, Exxon, Shell, and Amoco (attachment `2,' which now carries my `relevance' annotations). Per Mike, no conclusions were reached at this meeting. However, as a result of these meetings, this research, and other determinations between June 15 and July 15, Mike revised the deductible expenses from $.78 MCF (per November — April royalty payments, with April being paid June 15) to $.50/MCF (May and June royalty payments, with May being paid July 15). The changes were to reduce the deductible Exxon expenses from $.25/MCF to $.06/MCF (due to more definite information from Exxon) and to eliminate the HPC pipeline depreciation charge of $.11/MCF (due to paragraph 5.(b) of the lease saying that amortization of pipelines, processing plants etc. is specifically excluded as a deductible item).
 "Attachment `3' is a copy of Mike's 8-18-94 memo to me summarizing his and Meghan's research and showing the details of the $.78/MCF and the $.50/MCF.
 "Bob Luttrell believes that there should be no question about the deductibility of the Transco fee (of approximately $.17/MCF). He feels that this should be thought of as an adjustment of the sale price rather than as an expense.
 "Assuming that we all agree with Bob on the Transco fee, this leaves $.33/MCF (estimated to amount to $7 million over the life of the lease) in question. Once we decide for sure what expenses, if any, to deduct, we will recalculate all royalty payments to date and make up the underpayments.
 "It seems that we should have as aggressive a position as we think we can without risking the lease (and that the risk should be considered from a practical, versus strictly theoretical, standpoint). The Amoco information seems to provide sufficient basis for continuing our $.50/MCF deduction. By copy of this memo, I am asking Mike to confirm their lease language (paragraph 5 the *Page 21 
same?) and to find out if their royalty is `significant' dollar-wise. We will then pass this information on to you.
 "Then, I think we, Accounting, will have gone about as far as we can with this question and will pass it on to you, Frank, for further handling and deciding."
This memorandum followed a previous memorandum in which Terry Morris wrote, in pertinent part:
 "Meghan and I have discussed the possible deduction of the expenses associated with adding value to the Norphlet Unit gas with personnel from the following companies:
"Amoco Production Company
"Exxon Company, U.S.A.
"Mobil Oil Corporation
"Shell Oil Company
"We have found that:
 "Amoco is taking the position that (Paragraph 5b of the Alabama Standard Oil Gas Lease Form, February 1981) `less reasonable direct costs' applies to gas. These costs include all costs to make gas marketable and to get it to market. Amoco has just been audited, and we are checking to learn the audit findings.
 "Exxon is taking a much more aggressive position. They are taking deductions for Exxon's gathering charges, Mobil's charges, and Transco's post-plant transportation charges. Since Exxon invested in the pipeline and processing plant, their deductions are more restricted than HPC's.
 "Mobil has a far less restrictive lease (1969) than our lease. They were very good about recommending other sources of information.
 "Shell is not taking any deductions for the royalty share of the gas, an extremely conservative interpretation of the lease."
On September 6, 1994, Morris prepared another memorandum for Howell and copied the memorandum to other Hunt executives. The memorandum states, in pertinent part:
 "Meghan has confirmed with Daniel Smith of Amoco that paragraph 5((a) and (b)) of the Amoco lease form is the same as ours and that the Amoco production is substantial.
 "For now we will continue to calculate the deductible expenses as detailed in my memo ($.33 + .17 = $.50/MCF). We do need to file amended royalty reports pretty soon (to reflect the change from $.78/MCF to $.50/MCF or whatever number is decided upon). We are looking to you to tell us what to do."
In 1995, the State hired an outside auditor with expertise in auditing natural gas plants to audit all of the gas lease agreements executed by the State. On March 16, 1995, in a handwritten memorandum, Early told Morris, the controller of Hunt, that senior vice president of oil and finance Howell and director of internal audit Rushbrook had agreed to place $1.2 million in reserves to cover royalties that would be owed to the State if the State disallowed various deductions taken by Exxon. The deduction of such expenses had delayed payment of royalties and, thus, had delayed the increase in the royalty percentage owed the State from 16 2/3% to 25%. If the State were to disallow the deductions taken by Exxon, royalty payment would be deemed to have occurred much earlier, and Hunt would owe the State an additional $1.2 million in royalties.
On March 18, 1997, the State notified Hunt that the State intended to audit Hunt's records for Tract 114 on August 4, 1997. On March 20, 1997, Hunt mailed a $249,000 check to the State and amended *Page 22 
its royalty reports for the 1993-94 underpayments owed by Hunt for the unauthorized pipeline-depreciation deduction.
On its face, this undisputed evidence has all the markings of a company deliberating taking what were the maximum deductions possible under the lease agreement. If a party was planning on ignoring the language of the lease agreement for maximum profit, it would not likely expend time and energy meeting to discuss what deductions were possible under the lease agreement and would certainly not voluntarily give up deductions or put money in reserves in case the deductions were later determined to be improper.
The difference between a case involving clear and convincing evidence of fraud and this case is demonstrated by examining cases relied on by the State involving direct evidence of the intentional fraud where the fraudulent activity cannot be reconciled to a mistaken interpretation of a contract provision. For example, in Braswell v. ConAgra, Inc., 936 F.2d 1169 (11th Cir. 1991),[18] a case relied on by the State and discussed in the majority opinion, see 901 So.2d 1, 9 n. 8, there was direct evidence indicating that the fraud was performed withcertain knowledge that the truck-weighing process was rigged, and the case did not center around a disputed interpretation of a contractual provision. In other words, even though ConAgra unsuccessfully attempted to argue that it was liable only for breach of contract, ConAgra's fraudulent activities were wholly unrelated to any alleged "misinterpretation" of its contract with the chicken growers. ConAgra made no contention that such a "weighing process" was permissible under its contract with the plaintiffs. While Braswell did not involve § 6-11-20, it provides an example of a "direct evidence" fraud case in which the very rigid standards of § 6-11-20 would be satisfied.
Additionally, in Gregory v. Chemical Waste Management, Inc.,38 F.Supp.2d 598 (W.D.Tenn. 1996), the United States District Court for the Western District of Tennessee, applying Alabama law, held that there was clear and convincing evidence of fraud justifying punitive damages against Chem Waste, which had deliberately and knowingly underpaid royalties: *Page 23 
 "Plaintiffs have established the elements for fraudulent misrepresentation . . . by clear and convincing evidence. Chem Waste sent Plaintiffs quarterly statements that falsely represented that the royalty payments were calculated on 12 1/2% of `disposal' revenues which term both parties understood and intended to include all revenues exclusive of transportation revenues according to the terms of the purchase agreement. Chem Waste sent Plaintiffs royalty checks that falsely represented the quarterly installment payments equaled 12 1/2% of all revenues from the operation of the hazardous waste landfill site as provided by the agreement. The Court finds the representations made by Defendant on the quarterly revenue summaries and the royalty checks related to a material fact. The Court finds Plaintiffs justifiably relied on the false statements in the revenue summaries and royalty checks. Lastly, the Court finds Plaintiffs sustained damages as a proximate result of Defendant's fraud."
38 F.Supp.2d at 611-12 (emphasis added). Additionally, the court noted that Chem Waste had "taken significant steps to conceal and cover-up its fraud." 38 F.Supp.2d at 625.
Here, on the other hand, Hunt's activities and reporting were completely consistent with how it, after much discussion, interpreted the lease agreement, i.e., that, under the lease agreement, royalties are to be paid from gas valuations at the wellhead rather than at the tailgate. The lack of direct or overwhelming indirect evidence of knowledge supporting an intent to deceive on Hunt's part, and the lack of evidence of concealment or cover-up is compelling. Even if the fraud claims had been properly submitted to the jury, I do not believe that there is "clear and convincing" evidence of intentional fraud that is "gross, oppressive, and malicious" in this case sufficient to allow the jury to impose punitive damages.[19]
[9] As I stated in my special concurrence in Dickinson, I believe Deupree involved a claim more in the nature of fraudulent inducement rather than, as the majority opinion indicated, fraudulent suppression.
[10] Contrary to the State's continued insistence in its briefs and at oral argument, the fact that the trial court ruled in favor of the State on its breach-of-contract claim and that Hunt chose not to challenge that ruling on appeal clearly does not mean in any sense that Hunt admits that it knew that its deductions were improper at the time it took them. See note 12.
[11] The State relies heavily on the implication that Hunt acted wrongfully in not consulting the State (the other contracting party) as to the reasonableness of Hunt's interpretation of the royalties provision in the lease agreement before Hunt began paying royalties. I believe that, as stated below, see note 12, this unfounded implication is a direct descendant of the confusion between breach-of-contract claims and fraud claims.
[12] The State makes much of this provision. However, this provision is relevant to, and will further the success of proving, a breach-of-contract claim. Contrary to the State's continued insinuations at trial, Hunt had no legal duty to inquire of the State whether Hunt was "properly" interpreting the lease agreement; while such a course of action may make for less troublesome business practices, there is certainly no legally recognized duty to do so. Hunt was entitled to act in accordance with its understanding of the contract, at the risk of losing an eventual breach-of-contract claim and paying whatever damages would then be necessary to make the State whole (and, in this case, paying the statutory 12% interest penalty for underpayment as required by Ala. Code 1975, § 9-17-33). This principle is not novel, nor is the principle that parties to contracts take "aggressive positions" in order to maximize the benefits they believe flow to them under the contract. That is what parties to contracts are expected to do; that is certainly what theState is properly attempting to do in this case. By itself, such a scenario is not fraud, even if the amounts involved arevery large and if one party's interpretation is later determinedto be wrong. Viewed alone, the reasonableness of the parties' interpretations of a contract is not evidence of fraud on either side; rather, it only makes the proof of a breach of contract that much easier or harder to prove. It is precisely with this type of evidence that we must not allow unreasonable
inferences, lest we destroy the distinction between breach of contract and fraud. See Eagle Prods., Inc. v. Glasscock,882 So.2d 280, 282 (Ala. 2003) ("`In reviewing a ruling on a motion for a judgment as a matter of law, this Court views the evidence in the light most favorable to the nonmovant and entertains suchreasonable inferences as the jury would have been free to draw.'" (quoting Bell v. T.R. Miller Mill Co., 768 So.2d 953,956 (Ala. 2000)) (emphasis added)).
[13] There is much obfuscation of the real issues that have to be addressed in this case, brought on, I believe, by the confusion between the breach-of-contract issues and the fraud claims. I firmly believe that Henry David Thoreau's words inWalden properly describe the function of an appellate court:
 "Let us settle ourselves, and work and wedge our feet downward through the mud and slush of opinion, and prejudice, and tradition, and delusion, and appearance, . . . till we come to a hard bottom and rocks in place, which we can call reality, and say, This is, and no mistake."
Having done that, I hope that I have reached the real heart of the matter or "rem acu tetigisti" (touched the point with a needle).
[14] As stated above, the State repeatedly refers to Hunt's failure to attach an affidavit to the reports swearing to the correctness of the monthly royalty reports. However, Hunt does not argue that this failure affects the "reasonableness" of the State's alleged reliance on unsworn monthly reports, or that the failure to include the reports began the running of the statute of limitations on the State's "improper deductions" fraud claim.
[15] "Malice" is defined in the statute as follows:
 "The intentional doing of a wrongful act without just cause or excuse, either:
 "a. With an intent to injure the person or property of another person or entity, or "b. Under such circumstances that the law will imply an evil intent."
Ala. Code 1975, § 6-11-20(b)(2). "Oppression" is defined as "[s]ubjecting a person to cruel and unjust hardship in conscious disregard of that person's rights." § 6-11-20(b)(5). The term "gross" is not defined.
[16] See note 12.
[17] Robert Macrory, a State employee and one of the State's witnesses at trial, testified that "there was never any question" that the State was going to audit Hunt (and each of the other oil companies that had lease agreements with the State) with respect to its reporting of gas production.
[18] In Braswell, the United States Court of Appeals for the Eleventh Circuit, applying Alabama law, affirmed the denial of ConAgra's motion for judgment notwithstanding the verdict (now referred to as a motion for a judgment as a matter of law, Rule 50, Ala. R. Civ. P.) as to fraud claims asserted by plaintiff chicken growers. The plaintiffs claimed, and a jury found, that ConAgra had committed fraud by rigging the weighing procedure on which basis ConAgra paid the plaintiffs. That procedure was as follows:
 "When ConAgra determined the proper time, it transported all the grown-out broilers to its plant. There, ConAgra employees used the following procedure to determine the payment due each grower: (1) they weighed the truck to obtain the `gross weight'; (2) they removed the broilers and weighed the truck again to establish the `tare weight'; and (3) they subtracted the tare weight from the gross weight to determine the `net weight' of the broilers. ConAgra then paid the growers according to the net weight, using a formula that accounted for the weight gained by the broilers and the amount of feed used by the grower."
Braswell, 936 F.2d at 1172 (footnote omitted). However, the evidence showed that ConAgra would initially weigh a light
truck (containing the plaintiffs' chickens) to determine the gross weight, then ConAgra would use a heavy truck (made "heavy" by adding metal grates or filling its two 50-gallon gas tanks) to determine the "tare weight," thus making for a lesser, inaccurate "net weight." 936 F.2d at 1174 n. 5. Also, ConAgra employees would use a wire "to alter the scale and artificially decrease gross weight." Id. ConAgra admitted that this deceitful practice had gone on for a while. Id.
[19] Even if the record supported a jury finding of intentional fraud by "clear and convincing evidence," I would still have several problems with the punitive-damages award, because I do not believe that the award is based on rational, guiding principles of punishment and deterrence that take into account the realities of this case (for example, the principle that the amount of money required to deter a profit-seeking company from acting in a certain way in the future is directly related to the company's perception of its chances of "getting away with" the action without discovery). However, my belief that no punitive damages would be appropriate obviates the need to discuss these problems.